# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

TELETRACKING TECHNOLOGIES, INC.,

     Plaintiff,

                                     Case No.:

vs.

ORLANDO HEALTH, INC.,

     Defendant.

_____/

**<u>VERIFIED COMPLAINT</u>**

Plaintiff TeleTracking Technologies, Inc. ("TeleTracking"), by its undersigned counsel, files this Complaint against Defendant Orlando Health, Inc. ("Orlando Health") and in support thereof states as follows:

**Introduction and Nature of the Action**

1.     TeleTracking is a software technology leader, providing hospitals and health systems with critical operational solutions to ensure that no patient waits for the care they need.

2.     Orlando Health is a 2,800-bed system that includes 13 wholly-owned hospitals and emergency departments; rehabilitation services, cancer institutes, heart institutes, imaging and laboratory services, wound care centers, physician offices for adults and pediatrics, skilled nursing facilities, an in-patient behavioral health facility, home healthcare services in partnership with LHC Group, and urgent care centers in partnership with CareSpot Urgent Care. Orlando Health's hospitals include: Orlando Health Orlando Regional Medical Center; Orlando Health Dr. P. Phillips Hospital; Orlando Health South Lake Hospital; Orlando Health South Seminole

Hospital; Orlando Health – Health Central Hospital; Orlando Health Arnold Palmer Hospital for Children; Orlando Health Winnie Palmer Hospital for Women & Babies and Orlando Health St. Cloud Hospital.

3.      On or about April 4, 2017, TeleTracking and Orlando Health entered into a written agreement, the TeleTracking Subscription and License Agreement ("TSLA"), governing their relationship and Orlando Health's use of TeleTracking's software and information.

4.      TeleTracking brings this complaint for preliminary and permanent injunctive relief to prevent Orlando Health from continuing to violate the TSLA by sharing, providing, or otherwise disclosing to any third party, including but not limited to Epic Systems Corporation ("Epic"), a competitor of TeleTracking, the content of TeleTracking's software, source code, technical information, documentation, support or training materials, software plans, designs, or the design or format of any graphical user interface (GUI), reports, results, output generated by the software and/or any other proprietary and confidential information.  TeleTracking also seeks relief requiring Orlando Health to demand from any third party the immediate return of all information shared in violation of the agreement.

5.      Upon information and belief, in violation of the TSLA, Orlando Health has also permitted a third party, Epic, to (i) modify or copy TeleTracking's Subscription Service, Software, Documentation, or Deliverables; or (ii) create a derivative work based on the Subscription Service, Software, Documentation, or Deliverables; or (iii) reverse engineer, reverse assemble, disassemble, or decompile any portion of the Subscription Service, Software, Documentation or Deliverables, including, but not limited to, any software utilized by TeleTracking in the provision of the Subscription Service or Software; or (iv) access the

Subscription Service, Software, Documentation, or Deliverables in order to build or develop any commercially available or competitive product or service; or (v) copy features, functions, integrations, Interfaces, reporting formats, or graphics of the Subscription Service, Software, Documentation or Deliverables.

6.     Accordingly, TeleTracking seeks all appropriate injunctive, monetary and other relief to remedy these contractual breaches and prevent such further unlawful conduct.

### Parties

7.     TeleTracking is a Delaware corporation with its principal place of business located at The Times Building, 336 Fourth Avenue, Pittsburgh, PA 15222.

8.     Orlando Health is a Florida not-for-profit corporation with its principal place of business located at 1414 Kuhl Avenue, MP 2, Orlando, FL 32806.

### Jurisdiction and Venue

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because the amount in dispute exceeds $75,000, exclusive of interest and costs, and diversity of citizenship exists between the parties.

10.     This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this district, it transacts business in this district, and/or it committed an unlawful or tortious act in this district.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Defendant maintains its principal place of business in this district, it transacts business in this district, it committed an illegal or tortious act in this district, and is otherwise subject to the Court's

personal jurisdiction with respect to this action.

12.     Venue is also proper in this Court because the TSLA contains a Florida choice of law and venue provision.  See Exhibit 1, Sections 20(i) and (w).

**Facts**

13.     TeleTracking and Orlando Health entered into the TSLA on or about April 4, 2017.  A true and correct copy of the TSLA is attached hereto as Exhibit 1.

14.     Among other obligations, Orlando Health agreed that, "Confidential Information" means (a) any software utilized by TeleTracking in the provision of the Software and respective source code;…(c) each party's technical information, including, but not limited, to TeleTracking's Documentation, Support, training materials, any information relating to software plans, designs, or the design or format of any graphical user interface (GUI), reports, results, and output generated by the Software; (d) each party's business information, including, but not limited to costs, prices, finances, marketing plans, business opportunities, personnel, research, development or know-how, that is designated by the disclosing party as "confidential" or "proprietary" or the receiving party knows, or should reasonably know, is confidential or proprietary;…." See Exhibit 1, TSLA, at Section 1, Definitions (hereinafter "Confidential Information").

15.     In the TSLA, Orlando Health also agreed that TeleTracking owns "all rights, title and interest in and to the subscription Service, Software and Documentation, including all training materials, software designs, and the design or format of any graphical user interface (GUI), report, result, or other output generated by the Subscription Service or Software (other than Client Data) and all related Intellectual Property Rights and any Improvements or other

modifications, enhancements, customizations, and derivative works thereof. In addition, TeleTracking shall have a royalty-free, worldwide, transferable, sub-licensable irrevocable, and perpetual license to use or incorporate into the Subscription Service, Software or Documentation any Client Feedback." Further, "[a]ll rights, title and Interest to all ideas, techniques, know-how, designs, programs, development tools, processes, Integrations, interfaces, enhancements, and other technical information developed by TeleTracking in the course of performing Professional Services, and all Client Feedback pertaining thereto, shall vest solely and exclusively with TeleTracking." See Exhibit 1, TSLA, Section 13(b) (hereinafter "Proprietary Rights").

16.     Further, in Section 13(d) of the TSLA, Orlando Health agreed that it would not, nor would it: "permit any third party to, (i) modify or copy the Subscription Service, Software, Documentation, or Deliverables, or create any derivative works based on the Subscription Service, Software, Documentation, or Deliverables, except that Client may make a reasonable number of copies of the Documentation and Deliverables as necessary to use the Subscription Service or Software;… (iii) reverse engineer, reverse assemble, disassemble, or decompile any portion of the Subscription Service, Software, Documentation or Deliverables, including, but not limited to, any software utilized by TeleTracking in the provision of the Subscription Service or Software; (iv) access the Subscription Service, Software, Documentation, or Deliverables in order to build or develop any commercially available or competitive product or service; (v) copy any features, functions, integrations, Interfaces, reporting formats, or graphics of the Subscription Service, Software, Documentation or Deliverables;…" See Exhibit 1, TSLA, Section 13(d) (hereinafter "Prohibitions").

17.     In addition, Section 14 of the TSLA governs the parties' Confidentiality Obligations and states in relevant part: "A party will not disclose other than to its employees,

directors, advisors, contractors or agents with a need to know and who are under nondisclosure obligations  or use any Confidential Information of the other party, except as reasonably necessary to perform its obligations or exercise its rights pursuant to this Agreement, without the other party's prior written permission."  See Exhibit 1, TSLA, Section 14 (hereinafter "Confidentiality Restrictions").

18.     On August 24, 2020, representatives of TeleTracking participated in a meeting, in-person and via video conference, with Orlando Health representatives – Transport Manager, Katy Henderson and Lead Supervisor, Nick Daly ("Hospital Employees") – at Dr. Phillips Hospital of Orlando Health ("Hospital").  The meeting was organized for a current state of assessment of the Hospital's use of TeleTracking's solutions and services and to identify opportunities for improvement.

19.     During the meeting, the Hospital Employees advised TeleTracking that the Hospital will be going live with competing replacement solutions from Epic at the end of January 2021, not in two years as they previously had advised.

20.     During the meeting, the Hospital Employees admitted to, at a minimum, sharing and/or describing for Epic TeleTracking's software platform functionality and the content of TeleTracking's output and reports.

21.     The Hospital Employees stated that they informed Epic that, in order to make the transition to Epic in January 2021, they needed to have the certain functionality available in TeleTracking's platform, reports and solutions not currently available in Epic's competing product(s).

22.     According to the Hospital Employees, Epic had stated that, although it did not

currently have the functionality, it would commit to build such functionality by the Hospital's "go-live" date with Epic in January 2021.

23.     The Hospital Employees admitted to, in particular, describing TeleTracking's Equipment Return functionality to Epic.

24.     The Hospital Employees also informed TeleTracking that they shared with Epic the substance and content of TeleTracking's reports currently used by the Hospital to help with employee improvements in their departments.  TeleTracking understands that the Hospital Employees have asked Epic to duplicate the output of these reports.

25.     Upon information and belief, Orlando Health has inappropriately shared other Confidential Information with Epic and/or has otherwise violated TeleTracking's Proprietary Rights, in violation of the Confidentiality Restrictions.

26.     Upon information and belief, Orlando Health has violated, and/or has aided Epic in violating, one or more of the Prohibitions.

27.     On September 3, 2020, TeleTracking sent the required notice under the TSLA to Orlando Health of its material breach of the agreement and sought Orlando Health's immediate assurances that it would abide by its obligations under the TSLA and confirm that all conduct in violation of the TSLA would be stopped (the "Notice").  A true and correct copy of the Notice is attached hereto as Exhibit 2.  As of the filing of this Complaint, no such assurances from Orlando Health have been received by TeleTracking.

### COUNT I – BREACH OF CONTRACT – INJUNCTIVE RELIEF

28.     TeleTracking incorporates paragraphs 1 through 27 as though fully set forth at

length herein.

29.     TeleTracking and Orlando Health are parties to a written agreement which sets forth Orlando Health's obligations with respect to the use and treatment of TeleTracking's software, Confidential Information and/or Proprietary Rights.  The agreement sets forth Confidentiality Restrictions and Prohibitions.

30.     Orlando Health has breached those obligations by wrongfully disclosing Confidential Information protected by the TSLA to Epic and/or by violating TeleTracking's Proprietary Rights in disclosing such information and materials to Epic.

31.     In violation of the Confidentiality Restrictions and the Prohibitions, Orlando Health has also, upon information and belief, permitted a third party, Epic, to (i) modify or copy TeleTracking's Subscription Service, Software, Documentation, or Deliverables; or (ii) create a derivative work based on the Subscription Service, Software, Documentation, or Deliverables; or (iii) reverse engineer, reverse assemble, disassemble, or decompile any portion of the Subscription Service, Software, Documentation or Deliverables, including, but not limited to, any software utilized by TeleTracking in the provision of the Subscription Service or Software; or (iv) access the Subscription Service, Software, Documentation, or Deliverables in order to build or develop any commercially available or competitive product or service; or (v) copy features, functions, integrations, Interfaces, reporting formats, or graphics of the Subscription Service, Software, Documentation or Deliverables.

32.     Orlando Health's conduct is in breach of the TSLA and has caused and will continue to cause irreparable harm to TeleTracking if the conduct is not halted immediately.

33.     Section 14(d) of the TSLA permits TeleTracking "to seek injunctive relief to

enjoin such acts, without the necessity of proving actual damages or posting bond." <u>See</u> Exhibit 1, TSLA, Section 14(d).

WHEREFORE, TeleTracking respectfully requests that this Court enter judgment in its favor and against Orlando Health and award a preliminary and then permanent injunction requiring Orlando Health to:

1. cease from disclosing or communicating any of TeleTracking's Confidential Information or Proprietary Rights to any third party, including but not limited to Epic, or to use or refer to such information for any purpose other than that permitted by the TSLA.

2. demand that Epic cease and desist from:

   i. modifying or copying the Subscription Service, Software, Documentation, or Deliverables, or creating any derivative works based on the Subscription Service, Software, Documentation, or Deliverables;

   ii. reverse engineering, reverse assembling, disassembling, or decompiling any portion of the Subscription Service, Software, Documentation or Deliverables, including, but not limited to, any software utilized by TeleTracking in the provision of the Subscription Service or Software;

   iii. accessing the Subscription Service, Software, Documentation, or Deliverables in order to build or develop any commercially available or competitive product or service;

   iv. copying any features, functions, integrations, Interfaces, reporting formats, or graphics of the Subscription Service, Software, Documentation or Deliverables.

3. Identify any Confidential Information or Proprietary Rights belonging to TeleTracking that Orlando Health has shared with any third party, including but not limited Epic.

4.   Request the immediate return of any of TeleTracking's Confidential Information or Proprietary Rights information or documentation from Epic and any other third party with whom Orlando Health shared such information.

## COUNT II – BREACH OF CONTRACT – DAMAGES

34.   TeleTracking incorporates paragraphs 1 through 27 as though fully set forth at length herein.

35.   TeleTracking and Orlando Health are parties to a written agreement which sets forth Orlando Health's obligations with respect to the use and treatment of TeleTracking's software, Confidential Information and/or Proprietary Rights.  The agreement sets forth Confidentiality Restrictions and Prohibitions.

36.   Orlando Health has breached those obligations by wrongfully disclosing Confidential Information protected by the TSLA to Epic and/or by violating TeleTracking's Proprietary Rights in disclosing such information and materials to Epic.

37.   In violation of the Confidentiality Restrictions and the Prohibitions, Orlando Health has also, upon information and belief, permitted a third party, Epic, to (i) modify or copy TeleTracking's Subscription Service, Software, Documentation, or Deliverables; or (ii) create a derivative work based on the Subscription Service, Software, Documentation, or Deliverables; or (iii) reverse engineer, reverse assemble, disassemble, or decompile any portion of the Subscription Service, Software, Documentation or Deliverables, including, but not limited to, any software utilized by TeleTracking in the provision of the Subscription Service or Software; or (iv) access the Subscription Service, Software, Documentation, or Deliverables in order to build or develop any commercially available or competitive product or service; or (v) copy

features, functions, integrations, Interfaces, reporting formats, or graphics of the Subscription

Service, Software, Documentation or Deliverables.

38.     Orlando Health's conduct is in material breach of the TSLA.  As a direct result of

this breach, TeleTracking has been damaged and will continue to be damaged in an amount in

excess of $75,000 to be proven at trial.

WHEREFORE, TeleTracking respectfully requests that this Court enter judgment in its

favor and against Defendant for an amount in excess of $75,000 to be determined at trial, plus

costs, interest and any other amount this Court deems just and proper.

## DEMAND FOR JURY TRIAL

TeleTracking demands trial by jury in this action for all issues triable.

Respectfully Submitted,

**BLANK ROME LLP**

*/s/ Michelle M. Gervais*
MICHELLE M. GERVAIS
Florida Bar No. 173827
201 E. Kennedy Blvd., Suite 520
Tampa, FL 33602
Telephone: (813) 255-2323
Facsimile: (813) 435-2256
MGervais@BlankRome.com
JAYME L. BUTCHER
 (*Pro hac vice* to be filed)
501 Grant Street, Suite 850
Pittsburgh, PA 15219
Phone: (412) 932-2800
Facsimile: (412) 932-2777
jbutcher@BlankRome.com

*Counsel for Plaintiff*
*TeleTracking Technologies, Inc.*

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| TELETRACKING TECHNOLOGIES, INC.,<br><br>      Plaintiff,<br><br>vs.<br><br>ORLANDO HEALTH, INC.,<br><br>      Defendant. | |

## **VERIFICATION**

I, MARIA ROMANO, verify that I am a Clinical Advisor with TeleTracking

Technologies, Inc., and that I am authorized to execute this verification on its behalf.  Having

read the foregoing Verified Complaint, I verify that the facts contained therein are true and

correct to the best of my knowledge, information and belief.

I understand that this verification is made subject to the penalties relating to unsworn

falsification to authorities, 28 U.S.C. § 1746.

Dated: September 18, 2020

Maria Romano

TeleTracking Technologies, Inc.
v.
Orlando Health, Inc.

Complaint Exhibit 1

DocuSign Envelope ID: B848B094-5A35-434C-BE55      95E4F86B0

## TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT

This TeleTracking Subscription and License Agreement ("TSLA"), effective as of the last date signed below ("**Effective Date**"), is by and between **TeleTracking Technologies, Inc. ("TeleTracking")**, a Delaware corporation with its principal place of business at The Times Building, 336 Fourth Avenue, Pittsburgh, PA 15222 and **Orlando Health, Inc. ("Client")**, with its principal place of business at 1414 Kuhl Avenue, Orlando, FL 32806.

Whereas, TeleTracking provides certain Subscription Services and licensed Software which Client or a Client Affiliate intends to procure and use through their Authorized Users, and this Agreement establishes the business relationship and allocation of responsibilities regarding the provision and use of such Subscription Services and Software;

Now, therefore, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties do hereby agree as follows:

1.       Definitions.

As used in this Agreement:

"**Acceptance**" means thirty (30) days post Go-Live Date at each Designated Facility with no critical issues outstanding.

"**Affiliate**" means any entity which directly or indirectly controls, is controlled by, or is under common control by a party.  For purposes of the preceding sentence, "control" means direct or indirect ownership or control of more than 50% of the voting interests of the subject entity.

"**Agreement**" means this TSLA, including the TeleTracking Support and Maintenance Policy and the TeleTracking Subscription Service - Service Level Availability Policy ("**SLA Policy**") (as each may be updated by TeleTracking from time to time), and all Order Forms, exhibits, and amendments hereto.

"**Authorized Users**" means any employees, contractors, or agents of Client and any healthcare providers or other persons authorized by Client to access and use the Subscription Service or Software, or to submit or receive Client Data by Client through access and use of the Subscription Service and Software, in accordance with this Agreement.

"**Client**" shall mean the Client identified in the introductory paragraph of this Agreement and any Client Affiliate that has executed an Order Form pursuant to this Agreement to procure Subscription Service, Software, Professional Services or Support under this Agreement, and their respective Authorized Users, as applicable.  For clarity, a Client Affiliate shall be a "Client" only as to the Subscription Service, Software, Professional Services or Support set forth in an Order Form on which such Client Affiliate is identified.

"**Client Affiliate**" shall mean any Affiliate of Client that has executed an Order Form pursuant to this Agreement.

"**Client Data**" means the electronic data or information submitted by Client or Authorized Users to the Subscription Service or Software, including protected health information, and personally identifiable information ("PII").

"**Client Feedback**" means suggestions, enhancement requests, recommendations or other feedback provided by Client and Authorized Users relating to the operation or functionality of the Subscription Service or Software.

"**Client Materials**" shall have the meaning set forth in Section 13(c).

"**Confidential Information**" means (a) any software utilized by TeleTracking in the provision of the Subscription Service or Software and respective source code; (b) Client Data; (c) each party's technical information, including, but not limited, to TeleTracking's Documentation, Support, training materials, any information relating to software plans, designs, or the design or format of any graphical user interface (GUI), reports, results, and output generated by the Subscription Service or Software, (d) each party's business information, including, but not limited to, costs, prices, finances, marketing plans, business opportunities, personnel, research, development or know-how, that is designated by the disclosing party as "confidential" or "proprietary" or the receiving party knows, or should reasonably know, is confidential or proprietary; and (e) the terms, conditions and pricing of this Agreement (but not its existence or parties).

"**Advisory Services**" shall have the meaning set forth in Section 6.

"**Deliverable**" shall have the meaning set forth in Section 6.

## TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT

**"Designated Facility"** means a facility or facilities of Client designated in an Order Form for which Client's use of the Subscription Service or Software is authorized or for which Professional Services will be provided.

**"Designated Area"** means the specific department(s) or other diagnostic, procedural, or functional area(s) within a Designated Facility for which Client's use of the Subscription Service or Software is authorized.

**"Documentation"** means all applicable electronic and hardcopy documentation for use of the Subscription Service or Software that is made available to Client, including, without limitation, online help files, user manuals, administrator guides, release notes, specifications, technical information references, and training materials, and which may be updated by TeleTracking from time to time.

**"First Productive Use"** means the point in time when Client first uses the applicable Subscription Service or Software in a live, production environment at a Designated Facility, as set forth in an applicable Order Form or SOW.

**"Go-Live Date"** means the mutually determined date of First Productive Use.

**"Implementation Deadline"** means the date by which Client agrees to complete the implementation of the Subscription Service or Software as set forth in an Order Form and described in Section 7.

**"Implementation Services"** shall have the meaning set forth in Section 6.

**"Improvements"** means all improvements, updates, enhancements, modifications, error corrections, bug fixes, upgrades and changes to the Subscription Service, Software, and Documentation, as developed by TeleTracking and made generally available for commercial use without a separate subscription fee or license fee chargeable to Client.

**"Installation Site"** means a Designated Facility or other site of Client set forth in an Order Form for which Client's installation of Software is authorized in order for the Designated Facility to access and use the Software.

**"Intellectual Property Rights"** means any and all common law, statutory and other industrial property rights and intellectual property rights, including copyrights, trademarks, trade secrets, patents and other proprietary rights, issued, honored or enforceable under any applicable Law, anywhere in the world, and all moral rights related thereto.

**"Law"** means any local, state, national or foreign laws, treaties, or regulations, applicable to a respective party.

**"License Term"** means the period of time that Client is authorized to use Software, as described in Section 19(b). The License Term for Software may be a perpetual License Term or non-perpetual License Term.

**"Malicious Code"** means viruses, worms, time bombs, Trojan horses and other malicious code, files, scripts, agents or programs.

**"Non-Production System"** shall have the meaning set forth in Section 8.

**"Order Form"** means a separate ordering document provided by TeleTracking and any applicable Statement of Work attached or executed pursuant thereto, which references and is executed by both parties pursuant to the terms and conditions of this Agreement, and under which Client subscribes to the Subscription Service, licenses Software, or purchases Support or Professional Services for a Designated Facility or Designated Area for the period of time specified therein.

**"Platform"** means the TeleTracking software platform, as set forth in an Order Form, upon which the Subscription Service or Software is designed to function, as well as any Improvements or interfaces thereto provided by TeleTracking. The Platform shall be considered part of the Software or Subscription Services, as applicable.

**"Post-Implementation Services"** shall have the meaning set forth in Section 6.

**"Professional Services"** shall have the meaning set forth in Section 6.

**"Subscription Service"** means TeleTracking's software-as-a-service applications set forth in an Order Form and any improvements and interfaces thereto provided by TeleTracking.

**"Software"** means TeleTracking's on-premise software applications set forth in an Order Form and any improvements and interfaces thereto provided by TeleTracking.

DocuSign Envelope ID: B848B094-5A35-434C-BE55      95E4F86B0

## TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT

**"Start Date"** means, for each applicable Subscription Service or Software at each Designated Facility or Designated Area, the date on which the applicable Subscription Term or License Term commences, which date shall be the earlier of the applicable Go-Live Date or Implementation Deadline unless otherwise set forth in an Order Form.

**"Statement of Work"** shall have the meaning set forth in Section 6.

**"Subscription Term"** shall have the meaning set forth in Section 19(b).

**"Support"** shall have the meaning set forth in Section 5.

**"Support Term"** means the period for which TeleTracking will provide Support for the Subscription Service or Software as described in Section 19(c).

**"Term"** has the meaning set forth in Section 19(a).

**"Third Party Hardware"** shall have the meaning set forth in Section 10(b).

**"Third Party Software"** shall have the meaning set forth in Section 10(a).

2.  **TeleTracking Obligations.** During the Term of this Agreement, TeleTracking will make the Subscription Service or Software available to Client in accordance with this Agreement and Documentation for the applicable Subscription Service or Software. To the extent Client purchases TeleTracking Software, Subscription Services, Professional Services and/or Support ("TeleTracking Products") through an authorized TeleTracking reseller ("Reseller"): (i) such Reseller shall invoice Client directly for such TeleTracking Products and Client shall pay Reseller directly for such TeleTracking Products, in which case, after Client pays such Reseller, Client will not be liable for payment to TeleTracking should Reseller not pay TeleTracking; (ii) certain terms and conditions in this Agreement may be not be applicable to such purchase through the Reseller, including but not limited to certain provisions in Section 7 (Implementation and Go-Live), specifically Implementation Deadline, Section 12 (Payment Provisions) and Section 19 (Term & Termination), unless otherwise set forth in the agreement between Client and Reseller; and (iii) the term and payment provisions specified in the applicable Reseller agreement will control.

3.  **Subscription Service and License.**

(a)  **Grant of Rights to Subscription Service.** Upon payment of the applicable fees for the Subscription Service in accordance with an Order Form hereunder, TeleTracking hereby grants Client a limited, revocable, non-exclusive, non-transferable, and non-sublicensable right and license to access and use the Subscription Service and Documentation, solely for the internal business purposes of Client and solely during the applicable Subscription Term, subject to the terms and conditions of this Agreement.

(b)  **Grant of Rights to Software.** Upon payment of the applicable fees for the Software in accordance with an Order Form hereunder, TeleTracking hereby grants Client a limited, revocable, non-exclusive, non-transferable, and non-sublicensable right and license to use the Software and Documentation, solely for the internal business purposes of Client and solely during the applicable License Term, subject to the terms and conditions of this Agreement.

4.  **Client Obligations.** Client may enable access and use of the Subscription Service and Software only by Authorized Users at the Designated Facility and Designated Area and for the period set forth in the applicable Order Form, solely for the internal business purposes of Client in accordance with the applicable Documentation for the Subscription Service and Software and not for the benefit of any third party. Client is responsible for all Authorized User access to and use of the Subscription Service and Software and compliance with this Agreement. Client is solely responsible for: (a) the accuracy, quality, and legality of all Client Data; (b) the log-in, password, and security requirements for each Authorized User to access and use the Subscription Service and Software, and (c) preventing unauthorized access to, or use of, the Subscription Service or Software under its control. Client shall promptly notify TeleTracking of any unauthorized access to or use of Subscription Service or Software. Client will not: (i) use the Subscription Service or Software in violation of applicable Law; (ii) in connection with the Subscription Service or Software, send or store infringing, obscene, threatening, or otherwise unlawful or tortious material, including material that violates privacy rights; (iii) send, post, upload or otherwise transmit or store Malicious Code in connection with the Subscription Service or Software; (iv) interfere with or disrupt performance of the Subscription Service or Software or the data contained therein; (v) attempt to gain access to the Subscription Service, Software, or any related systems or networks, in a manner not set forth in the Documentation; (vi) share individual log-in information of Authorized Users among multiple users for use of the

3

**TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT**

Subscription Service or Software; or (vii) share personally identifiable patient data or protected health information with TeleTracking via unsecure transmission, or electronic mail without express written consent of TeleTracking.

5. **TeleTracking Support and Service Level.**

(a) **Subscription Service and Software Support.** During the Support Term, TeleTracking will provide Support for the applicable Subscription Service or Software in accordance with the TeleTracking Support and Maintenance Policy attached as **Exhibit A** and SLA Policy attached as **Exhibit B** (collectively, "Support"). As part of any Support Term, TeleTracking will also provide Client with online Documentation to assist Client in its use of the Subscription Service or Software. TeleTracking also offers additional training and advisory services in the form of Professional Services (as set forth below).

(b) **Subscription Service - Service Level Availability.** In the event that a Subscription Service fails to achieve the applicable Service Level Availability target set forth in the SLA Policy, Client will be entitled, as its sole and exclusive remedy, to credit and termination rights for the applicable Subscription Service in accordance with the terms set forth in the SLA Policy. Subscription Service system logs and other records shall be used for calculating any service level events.

6. **Professional Services.** The parties may, from time to time, agree upon the provision by TeleTracking of implementation, training, advisory services, integration, enhancement, modification, customization or other professional services related to the Subscription Service or Software ("Professional Services"), as set forth in an Order Form and Statement of Work attached thereto ("Statement of Work" or "SOW"). Professional Services may be provided and categorized separately in the form of (i) implementation services for the applicable Subscription Service or Software ("Implementation Services"); (ii) post-implementation services for the applicable Subscription Service or Software ("Post-Implementation Services"); or (iii) advisory services related to the applicable Subscription Service or Software, including, but not limited to, assistance with Client's related business processes ("Advisory Services"). Each SOW may include, among other information, (i) a description of the Professional Services to be provided to Client, and any work product or other deliverables or training materials to be developed or provided to Client (each, a "Deliverable"); (ii) the scope of Professional Services; and (iii) the applicable fees and payment terms for such Professional Services, if not specified in the Order Form. All Order Forms and SOWs for Professional Services shall be deemed part of, and subject to, this Agreement.

7. **Implementation and Go-Live.** TeleTracking shall provide Implementation Services to implement the Subscription Service or Software in accordance with specific delivery requirements and options set forth in the applicable SOW. Unless otherwise mutually agreed in writing, Client agrees to apply commercially reasonable efforts to complete Subscription Service or Software implementation at a Designated Facility and Designated Area, as applicable, by the implementation deadline set forth in the applicable Order Form ("Implementation Deadline"), provided that there are no delays of a material nature which are attributable to TeleTracking's conduct or lack of conduct. Implementation of the applicable Subscription Service or Software shall be deemed to have been delivered and accepted by Client as of the Go-Live Date set forth in an acceptance certificate which TeleTracking shall provide to Client and Client agrees to sign and deliver to TeleTracking upon completion of Implementation Services provided by TeleTracking in conformance with the applicable SOW. In the event that a signed acceptance certificate is not provided to TeleTracking upon completion of the Implementation Services, the applicable Subscription Service or Software shall be deemed to have been delivered and accepted by Client as of the Go-Live Date unless Client notifies TeleTracking in writing of any defects in the delivery of the Subscription Service or Software within thirty (30) days of the applicable Go-Live Date for such Subscription Service or Software. The Implementation Service records of TeleTracking will be used to validate the Go-Live Date if necessary. If Client does not notify TeleTracking of any defects in the delivery of the Implementation Services within thirty (30) days of the Go-Live Date, Client will promptly certify to TeleTracking in a signed acceptance certificate that the applicable Subscription Service or Software have been delivered and are accepted by Client as of the Go-Live Date. If, through no fault or delay of Client, the Implementation Services do not conform to the applicable SOW, and Client notifies TeleTracking of such defects in the delivery of the Subscription Service and Software within thirty (30) days of the Go-Live Date, TeleTracking will re-perform the non-conforming portions of the Implementation Services. Upon completion of conforming Implementation Services, if there are no defects, Client will promptly certify to TeleTracking in a signed acceptance certificate that the applicable Subscription Service or Software have been delivered and are accepted by Client and the Go-Live Date set forth in such acceptance certificate shall thereby be deemed the Go-Live Date for the applicable Subscription Service or Software. Unless due to a force majeure event, Client further agrees to provide TeleTracking not less than thirty (30) days' prior written notice to postpone any scheduled implementation to allow TeleTracking to reschedule resources to another project if necessary.

8. **Non-Production System.** TeleTracking may provide Client with access to certain Subscription Service(s) or Software in a non-production environment ("Non-Production System"). Any Non-Production System purchased by Client shall be set forth in an Order Form and Statement of Work, as applicable. In the event that Client purchases a Non-Production System for any

## TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT

applicable Subscription Service or Software, or is otherwise granted access to a Non-Production System, TeleTracking hereby grants to Client a limited, revocable, non-exclusive, non-transferable, and non-sublicensable right and license to permit Authorized Users to use the Subscription Service or Software made available to Client through such Non-Production System solely for evaluation, testing and training purposes for the Designated Facility set forth in the Order Form during the applicable Subscription Term or License Term. Client shall not use any Non-Production System for production use of any Subscription Service or Software in its normal business operations without prior written consent of TeleTracking.

9.  **Early Adopter Opportunities.** As part of TeleTracking's development and go-to-market processes, TeleTracking may offer Client the opportunity to participate in its early adopter program to test, validate, and evaluate new Subscription Service and Software at certain Designated Facilities or Designated Areas (each an "Early Adopter Opportunity"). In the event that Client participates in an Early Adopter Opportunity, TeleTracking hereby grants to Client a limited, revocable, non-exclusive, non-transferable, and non-sublicensable right and license to use, test, validate and evaluate the early adopter Subscription Service and Software at the Designated Facility and Designated Area, as applicable, set forth in the applicable Order Form, solely for the purpose of participating in the Early Adopter Opportunity during the early adopter term and subject to this Agreement including, without limitation, the Client Obligations set forth in Section 4 as to its use of the Subscription Service and Software and all rights and obligations with regard to TeleTracking's Proprietary Rights and Confidential Information set forth in Section 13 and 14 of this Agreement, respectively. Notwithstanding any other provision in this Agreement, early adopter Subscription Service and Software are provided "as-is" for purposes of testing, validating, and evaluating such Subscription Service and Software and TeleTracking makes no guarantee or warranty, express or implied, with regard to the early adopter Subscription Service or Software, or any Support therefor, or Client's use or inability to use such Subscription Service or Software, or the results of such use, in connection with the Early Adopter Opportunity. Additional rights and obligations in or to any Early Adopter Opportunity may be set forth in the early adopter terms annexed to an applicable Order Form or SOW and incorporated by reference as though set forth at length herein.

10.  **Third Party Products.**

(a)  **Third Party Software.** Except as otherwise provided by TeleTracking with the Subscription Service or Software, Client shall supply all third party software which is necessary for use in conjunction with the Subscription Service or Software ("Third Party Software") in accordance with the technical specifications set forth in the applicable Documentation. Client shall supply Third Party Software that meets TeleTracking's specifications for Third Party Software. Client is responsible for support of Third Party Software, including Third Party Software updates and upgrades, to the extent required to permit TeleTracking to provide Subscription Service or Software updates, upgrades and other improvements.

(b)  **Third Party Hardware.** Except as otherwise provided by TeleTracking with the Subscription Service or Software, Client shall supply all third party hardware and equipment which is necessary for use in conjunction with the Subscription Service or Software ("Third Party Hardware"). Client shall supply Third Party Hardware that meets TeleTracking's minimum required hardware specifications, as provided in writing to Client, for Third Party Hardware in accordance with the applicable Documentation. Client is responsible for support of Third Party Hardware, including Third Party Hardware updates and upgrades and maintenance, to the extent required to permit TeleTracking to provide Subscription Service or Software updates, upgrades and other improvements.

(c)  **TeleTracking Supplied Third Party Hardware.** Any Third Party Hardware which may be supplied by TeleTracking under this Agreement will be identified on the applicable Order Form or otherwise specified as being supplied by TeleTracking in the Documentation for the applicable Subscription Service or Software. TeleTracking will and hereby does convey all title, rights and interests in and to any Third Party Hardware which it supplies to Client as of any applicable Go-Live Date of the Subscription Service or Software associated with such Third Party Hardware. Additional rights and obligations in or to any Third Party Hardware, and support thereof, provided by TeleTracking, may be set forth in terms and conditions annexed to the applicable Order Form and incorporated by reference as though set forth at length herein.

(d)  **Third Party Proof of Licensing.** TeleTracking warrants that it has sufficient right, title, interest and authority to convey to Client the right to access and use any Third Party products, embedded or purchased separately through TeleTracking including, (i) software that TeleTracking does not own the rights to, (ii) TeleTracking Supplied Third Party Hardware and/or Third Party Hardware Operating System software not purchased by Client.

During the life of the Agreement, should Client ever be required to establish proof of purchase with an applicable third party vendor for any Third Party Software and/or Third Party Hardware which Client purchased through TeleTracking and TeleTracking fails to provide Client requested proof of purchase for any Third Party Software and/or Third Party Hardware which Client purchased through TeleTracking, TeleTracking will be liable for any true up costs Client is required to pay to third

**TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT**

party vendor for such proof of purchase violation. TeleTracking will not be responsible for any third party products purchased by the Client.

11.     **Other Licensed Applications.**  Client acknowledges that the Subscription Service and Software may integrate, function or interoperate with one another or with other licensed products of TeleTracking installed at an Installation Site or Designated Facility under a separate license agreement. Nothing in this Agreement shall, or is intended to, modify any separate license agreement between Client and TeleTracking including any license agreement or support for any TeleTracking product licensed separately by Client. Notwithstanding the foregoing, Client agrees to update or upgrade, from time to time, to any minimum versions of the Subscription Service or Software, or other licensed products of TeleTracking, as necessary to maintain compatibility and interoperability of the Subscription Service or Software as specified by TeleTracking or the Documentation. Any failure of Client to update or upgrade the TeleTracking Software in a timely manner may result in additional fees at TeleTracking's then-standard rates.

12.     **Payment Provisions.**

(a)     **Invoices and Payment.**  If TeleTracking Products are not purchased through a Reseller: all fees for the Subscription Service, Software, Professional Services, and Support will be invoiced to Client in accordance with the relevant Order Form. Except as otherwise set forth in an Order Form, all undisputed fees and expenses due hereunder (except fees subject to reasonable and good faith dispute) will be due and payable within thirty (30) days of Client's receipt of an invoice and are quoted and payable in United States Dollars. Any undisputed payment not received from Client by the due date under each applicable Order Form or SOW may (except with respect to fees then under reasonable and good faith dispute), at TeleTracking's discretion, accrue late charges at the rate of 1.5% of the outstanding balance per month, or the maximum rate permitted by law, whichever is lower, from the date such payment was due until the date paid.   Invoices shall be sent to Client at (i) , or to (ii) Health Central, 10000 West Colonial Drive, Ocoee, FL 34761, Attention: Accounts Payable.

(b)     **Annual Adjustment.**  If TeleTracking Products are not purchased through a Reseller: except as otherwise set forth in an applicable Order Form, all recurring fees during a Subscription Term, non-perpetual License Term, or Support Term are subject to an annual increase of 5% as of the twelve (12) month anniversary of each Start Date for the applicable Subscription Term, License Term, or Support Term.

(c)     **Travel Expenses.**  If authorized by Client in writing, unless otherwise stated in an applicable statement of work, Client will reimburse TeleTracking for the reasonable and necessary travel and living expenses incurred by TeleTracking in the performance of the Professional Services according to the Travel and Expense Policy as set forth in Exhibit C.

(d)     **Non-cancelable and Non-refundable.**  Except as otherwise agreed to in this Agreement or an Order Form, all fees and payment obligations for the Subscription Service, Software, and Support under any and all Order Forms are non-cancelable and all undisputed payments made are non-refundable.  All payment obligations for Professional Services actually provided to Client under any and all Order Forms are non-cancelable and amounts paid are non-refundable.

(e)     **Postponement Expenses.**  Except if due to force majeure events, in the event that Client postpones or cancels Professional Services with less than thirty (30) days' notice prior to a scheduled start date, Client agrees to pay TeleTracking for actual and non-refundable expenses incurred by TeleTracking in its performance leading up to the scheduled Professional Services, including all reasonable travel expenses and personnel time incurred up to such cancellation.

(f)     **Non-Payment and Suspension.**  If TeleTracking Products are not purchased through a Reseller: if Client's account is more than ninety (90) days past due (except with respect to fees subject to a reasonable and good faith dispute), in addition to any other rights or remedies it may have under this Agreement or by Law, TeleTracking reserves the right to: (i) suspend the applicable Subscription Service or Software, or otherwise terminate the applicable subscription or license, upon thirty (30) days' written notice, or (ii) cease providing Support or Professional Services to Client; without liability of TeleTracking to Client, until such amounts are paid in full or the parties mutually agree to acceptable terms of payment in writing.

(g)     **Taxes.**  TeleTracking's fees do not include any taxes that arise as a result of the products and services provided to Client, including, but not limited to, any local, state, provincial, federal or foreign taxes, levies, duties, or similar governmental assessments of any nature, including value-added, goods and services taxes, sales, excise, use or similar taxes (collectively, "Transaction Taxes"). Client is responsible for paying all Transaction Taxes associated with this Agreement, excluding income taxes of TeleTracking. If TeleTracking has a legal obligation to pay or collect Transaction Taxes for which Client is responsible

DocuSign Envelope ID: B848B094-5A35-434C-BE55    95E4F86B0

## TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT

under this section, the appropriate amount will be invoiced to and paid by Client unless Client provides TeleTracking with a valid tax exemption certificate authorized by the appropriate taxing authority and honored by the appropriate taxing authority.

(h)   **Payment Dispute.** In the event of invoice payment or nonpayment issues and/or discrepancies, the parties agree to provide each other with written notice describing such discrepancy and an opportunity to cure within thirty (30) days of receipt of the notice. During the cure period the parties agree that no action will be taken on the part of either party including but not limited to, interruption of service, credit holds or nonpayment of undisputed invoices. Notwithstanding the above, the parties agree that all invoice payment or nonpayment issues must be raised within two (2) years of invoice date or shall be deemed waived.

**TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT**

13. **Proprietary Rights.**

(a) **Ownership of Client Data.** As between TeleTracking and Client, Client owns its Client Data.

(b) **Ownership and Reservation of Rights to Subscription Service, Software, and Documentation.** Subject to the limited rights expressly granted hereunder, TeleTracking reserves all rights, title and interest in and to the Subscription Service, Software, and Documentation, including all training materials, software designs, and the design or format of any graphical user interface (GUI), report, result, or other output generated by the Subscription Service or Software (other than Client Data) and all related Intellectual Property Rights and any Improvements or other modifications, enhancements, customizations, and derivative works thereof. In addition, TeleTracking shall have a royalty-free, worldwide, transferable, sub-licensable, irrevocable, and perpetual license to use or incorporate into the Subscription Service, Software or Documentation any Client Feedback. TeleTracking has no obligation to make Client Feedback an Improvement. Client has no obligation to provide Client Feedback. Any rights not expressly granted to Client hereunder are reserved by TeleTracking.

(c) **Ownership and Reservation of Rights to Professional Services.** All rights, title and interest to all ideas, techniques, know-how, designs, programs, development tools, processes, integrations, interfaces, enhancements, and other technical information developed by TeleTracking in the course of performing Professional Services, and all Client Feedback pertaining thereto, shall vest solely and exclusively with TeleTracking. Except as otherwise set forth in a SOW, TeleTracking shall own all rights, title and interest in and to any Deliverables and related intellectual property rights (excluding any Client Materials or Client-Owned Deliverable, as defined herein). Unless otherwise set forth in an applicable SOW, TeleTracking grants to Client a limited, revocable, non-exclusive, non-transferable, and non-sublicensable right and license to use the Deliverables for Client's internal operations in connection with its authorized use of the applicable Subscription Service or Software and subject to the terms and restrictions regarding its use of the Subscription Service or Software. Client shall own and retain all rights, title and interest in and to any proprietary Client technology or Client-specific business processes or other materials ("Client Materials") provided to TeleTracking in connection with TeleTracking's performance of Professional Services, including all intellectual property rights thereto. TeleTracking shall have the limited right to use any such Client Materials solely for the purpose of providing the Professional Services to Client hereunder. Client shall further own any reports or other deliverables expressly identified as a "Client-Owned Deliverable" in a SOW.

(d) **Restrictions.** Client will not, nor permit any third party to, (i) modify or copy the Subscription Service, Software, Documentation, or Deliverables, or create any derivative works based on the Subscription Service, Software, Documentation, or Deliverables, except that Client may make a reasonable number of copies of the Documentation and Deliverables as necessary to use the Subscription Service or Software; (ii) sublicense, sell, resell, rent, lease, transfer, assign, distribute, time share, co-source, or offer in a service bureau the Subscription Service, Software, Documentation, or Deliverables, or otherwise make the Subscription Service, Software, Documentation, or Deliverables available to any third party, other than to Authorized Users as permitted herein; (iii) reverse engineer, reverse assemble, disassemble, or decompile any portion of the Subscription Service, Software, Documentation or Deliverables, including, but not limited to, any software utilized by TeleTracking in the provision of the Subscription Service or Software; (iv) access the Subscription Service, Software, Documentation, or Deliverables in order to build or develop any commercially available or competitive product or service; (v) copy any features, functions, integrations, interfaces, reporting formats, or graphics of the Subscription Service, Software, Documentation or Deliverables; or (vi) use or knowingly permit the use of any security testing tools in order to probe, scan or attempt to penetrate or ascertain the security of the Subscription Service or Software without prior written consent of TeleTracking.

(e) **Client Permitted Co-Branding.** During an applicable Subscription Term or License Term, TeleTracking may, in its sole discretion, permit Client to mark certain Subscription Service or Software applications with the Client name or trademark as provided to TeleTracking by Client from time to time in writing ("Client Trademarks"). In this event, Client grants to TeleTracking a limited, non-exclusive, non-transferable, non-sublicensable right and license to use the Client Trademarks during the Subscription Term or License Term solely for placement on the applicable Subscription Service or Software application. TeleTracking will use the Client Trademarks as provided to TeleTracking in accordance with any applicable policies of Client regarding the use of trademarks as established by Client and provided to TeleTracking from time to time. Nothing in this provision shall grant Client any rights or ownership in or to the Subscription Service or Software which shall, at all times, remain exclusively with TeleTracking.

(f) **Aggregate Data.** Client hereby grants to TeleTracking a royalty-free, worldwide, transferable, sub-licensable, irrevocable, perpetual license to anonymize and aggregate Client Data to derive anonymous usage data about the Subscription Service or Software ("Aggregate Data") for the sole purpose of optimizing healthcare operations through the products and services provided by TeleTracking in accordance with the United States Health Insurance Portability and Accountability Act (HIPAA) and

8

**TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT**

Health Information Technology for Economic and Clinical Health Act (HITECH), and their implementing regulations including 45 C.F.R. Part 164. In no event will Aggregate Data identify Client or its Affiliates, users or patients.

**14.** **Confidentiality Obligations.**

(a)     **Confidentiality.** A party will not disclose other than to its employees, directors, advisors, contractors or agents with a need to know and who are under nondisclosure obligations, or use any Confidential Information of the other party, except as reasonably necessary to perform its obligations or exercise its rights pursuant to this Agreement, without the other party's prior written permission.

(b)     **Protection.** Each party agrees to protect the Confidential Information of the other party in the same manner that it protects its own Confidential Information of like kind, but in no event using less than a reasonable standard of care.

(c)     **Compelled Disclosure.** A disclosure by one party of Confidential Information of the other party, to the extent required by Law, will not be considered a breach of this Agreement, provided the party so compelled promptly provides the other party with prior notice of such compelled disclosure (to the extent legally permitted) and provides reasonable assistance, at the other party's cost, if the other party wishes to contest or otherwise limit the disclosure.

(d)     **Remedies.** If a party discloses or uses (or threatens to disclose or use) any Confidential Information of the other party in breach of the confidentiality obligations hereunder, the other party will have the right, in addition to any other remedies available, to seek injunctive relief to enjoin such acts, without the necessity of proving actual damages or posting bond, it being acknowledged by the parties that any other available remedies may be inadequate.

(e)     **Exclusions.** Confidential Information will not include any information that: (i) is or becomes generally known to the public without breach of any obligation owed to the other party; (ii) was known to a party prior to its disclosure by the other party without breach of any obligation owed to the other party; (iii) was independently developed by a party without any Confidential Information of the other party or breach of any obligation owed to the other party; or (iv) is lawfully received from a third party without breach of any obligation owed to the other party.

(f)     TeleTracking acknowledges that Client is subject to various state and federal laws regarding the confidentiality and security of individually identifiable health information ("Protected Health Information" or "PHI"). Such state and federal laws include, but are not limited to, the Health Insurance Portability and Accountability Act of 1996 (P.L. 104-191) commonly known as HIPAA as well as the rules and regulations adopted and to be adopted in connection therewith. In the course of performing its obligations under this Agreement, TeleTracking may be provided or have access to PHI. TeleTracking agrees that any PHI received by it shall be held strictly confidential, and shall not be used by TeleTracking or disclosed by TeleTracking except as specifically provided in a separate writing (e.g. Business Associate Agreement) or as required by law.

**15.** **Protection and Security.**

(a)     **TeleTracking Security.** During the Term of this Agreement, TeleTracking will maintain reasonable and appropriate security measures in accordance with industry standards that are designed to: (i) ensure the security and integrity of Client Data; (ii) protect against threats or hazards to the security or integrity of Client Data; and (iii) prevent unauthorized access to Client Data. TeleTracking may change and update its security measures from time to time to further protect the Subscription Service, Software, and Client Data. Notwithstanding the foregoing, Client understands that it has an independent duty to comply with any and all Law applicable to it.

(b)     **Client Network and Internet Access.** Client is responsible for procuring and maintaining the Client network and network connections that connect the Client network to the Subscription Service or Software, and all reasonable and appropriate security measures therefor, including, but not limited to, "browser" software that supports protocols used by TeleTracking, including Secure Socket Layer (SSL) protocol or other protocols accepted by TeleTracking, and to follow secure log-on procedures for services that support such protocols. TeleTracking is not responsible for any compromise of data transmitted across computer networks or telecommunications facilities (including, but not limited to, the internet and mobile devices) which are not owned or operated by TeleTracking. TeleTracking assumes no responsibility for the reliability or performance of the Client network or any Client network connections as described in this Section.

(c)     **Unauthorized Disclosure.** If either party believes that there has been a breach of security with regard to Client Data, such party must promptly notify the other party and each party agrees to reasonably assist the other party in mitigating any potential

## TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT

damage caused by an actual breach of security. Upon Client's request, TeleTracking and Client will consult in good faith regarding a root cause analysis and any remediation efforts.

**(d)** **Anti-virus.** TeleTracking shall use commercially reasonable measures to screen products to avoid viruses or other destructive programs or codes.

**(e)** **Further Security Provisions.**

(1) If TeleTracking is to be provided one or more User I.D.(s) and Password(s) in order to access information on Client's system, TeleTracking agrees to comply with all commercially reasonable policies and procedures of Client provided to TeleTracking for assignment and maintenance of such User I.D.(s) and Password(s), and ensure that every employee or subcontractor of TeleTracking who is permitted to access the system also complies with such policies and procedures and all confidentiality obligations under this Agreement. Pursuant to the foregoing, TeleTracking agrees that an officer of TeleTracking will sign a single, mutually agreeable Client "Non-Employee Statement of Confidentiality" on behalf of all TeleTracking employees who may be provided with such access.

(2) If applicable, TeleTracking employees provided with access to Client's system will use PHI solely for the purpose of performing TeleTracking's obligations in accordance with this Agreement and shall not use PHI in any manner that would constitute a violation of any federal or state law or regulation, including but not limited to the Privacy and Security Rules (45 C.F.R. Parts 160 and 164) enacted pursuant to the Health Insurance Portability and Accountability Act of 1966 (HIPAA) and Section 395.3025, Florida Statutes.

(3) If applicable, TeleTracking agrees to use commercially reasonable ongoing efforts to maintain system security over the Internet to at least current industry standards when accessing Client's information systems and network, which shall include an acceptable minimum encryption standard of 128 bit Secure Socket Layer (SSL) encryption.

(4) TeleTracking agrees that no PHI will be maintained on personal computing or mobile devices or electronic media (including but not limited to laptop computers, smartphones, USB drives) unless such PHI is encrypted with FIPS certified encryption. TeleTracking agrees to comply with any other commercially reasonable restrictions adopted by Client from time to time with respect to use of mobile devices. TeleTracking agrees to review and adopt, in TeleTracking's sole discretion, any other commercially reasonable restrictions adopted by Client, from time to time, with respect to use of mobile devices.

(5) If applicable, TeleTracking will use Client's multiple factor user authentication for remote access to its systems and networks including email systems and/or web portals that contain Client PHI or PII.

(6) TeleTracking agrees to defend, indemnify and hold Client, its officers, directors, employees, and agents harmless, from and against all claims, liabilities, suits, judgments, fines, assessments, penalties, damages, costs, and other expenses or any kind or nature whatsoever, including without limitation, reasonable and necessary attorney's fees, expert witness fees, and costs of investigation, litigation or dispute resolution, to the extent arising out of and directly caused by any breach by TeleTracking of its obligations in connection with the privacy and security of PHI and/or the illegal use or disclosure of PHI provided to TeleTracking in connection with the Agreement, by TeleTracking, its agents, representatives, officers, employees or subcontractors. These indemnities shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of the Agreement for so long as any Client PHI is in possession or control of TeleTracking.

(7) If applicable, upon Client's request, and only with regard to systems hosted or managed by TeleTracking for Client, TeleTracking agrees to provide certification of all Microsoft operating system (OS) security patches or other applicable software (Ex. Flash, Java etc.) within thirty (30) days of the patch's release. If TeleTracking cannot provide this, TeleTracking must provide, in writing, guidance for each non-certified patch. Under no circumstances should TeleTracking's ability to validate and support OS security patches or other applicable software (Ex. Flash, Java etc.) exceed six (6) months from the date of the patch release.

(8) If applicable, TeleTracking will use only a SOC 2 Type 2 certified data center to host Client information unless otherwise mutually agreed with Client. If applicable, TeleTracking, or its representatives or licensors, will perform periodic SOC 2 Type 2 audits, or other generally recognized and comparable industry practices or standards and third party security assessments including vulnerability and penetration tests. TeleTracking will provide upon written request, a summary of their third-party security assessments of facilities hosting Client Data. If applicable, TeleTracking shall thereafter provide

**TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT**

Client, upon its written request, a copy of any available then-current SOC 2 Type 2 report, or other generally recognized and comparable industry report and a summary report of the results of third party security assessments.

(9) If applicable, TeleTracking certifies that software provided or systems with access to PHI has no known security vulnerabilities identified in the NIST National Vulnerability Database CVSS v2.0 with a base score of either 4.0 or higher and SANS Top 20 Vulnerabilities. Servers and operating systems are configured using secure system hardening templates from one of the following resources NIST, NSA, DISA, the Center for Internet Security (CIS).Periodic vulnerability testing and third party security audits are regularly conducted to identify security vulnerabilities. Security vulnerabilities identified in such audits and vulnerability scans are corrected timely. If applicable, Client has the right to request permission to view security audit and vulnerability scan reports or summary thereof from TeleTracking, which permission shall not be unreasonably withheld.

(10) If applicable, TeleTracking agrees at all times during an applicable Support Term, and provided that Client is current on its payment obligations, to provide, maintain and support its Software and subsequent updates, upgrades, and bug fixes such that the Software is, and remains secure from those vulnerabilities as required by Law and in accordance with industry standards.

**16.    Warranties & Disclaimers.**

(a)    **Mutual Warranties.** Each party and any Affiliate executing an Order Form pursuant to this Agreement, warrants that it has the authority to enter into this Agreement and, in connection with its performance of this Agreement, will comply with all Law applicable to it, including, but not limited to, Laws related to data privacy and security, international communications and the transmission of technical or personal data.

(b)    **Product Warranty.** TeleTracking warrants that it has sufficient right, title, interest and authority to convey to Client the right to access and use the Subscription Service or Software granted in this Agreement. TeleTracking further warrants that during the Support Term for any Subscription Service or Software ordered under this Agreement, the applicable Subscription Service or Software will perform materially in accordance with the applicable Documentation and the functionality of the Subscription Service or Software will not materially decrease.  Further, TeleTracking warrants that any Subscription Service and Software shall (1) be free of (i) any defect in material of the media in which the Software is delivered, and (ii) any virus or other program routine designed to erase or otherwise harm Client's hardware, data, or other programs; and (2) produce correct results for all daylight savings time changes as recognized by the State of Florida.  Any date and time software changes shall be made available to Client no fewer than 60 days prior to the effective date of the change.

(c)    **Professional Services Warranty.** TeleTracking warrants to Client that the Professional Services provided by TeleTracking will be performed in a professional manner and in accordance with generally prevailing industry standards, and that the Deliverables provided to Client as part of any Professional Services will materially conform to the applicable Statement of Work.

(d)    **Warranty Remedies.** As Client's sole and exclusive remedy and TeleTracking's sole liability for breach of the warranty set forth in Section 16(b) and 16(c), TeleTracking will correct the non-conforming Subscription Service, Software, Professional Services, or Deliverables at no additional charge to Client, or, in the event TeleTracking is unable to correct such deficiencies after good-faith efforts, TeleTracking will provide to Client a pro-rata refund of the amounts paid by Client that are attributable to the defective Subscription Service, Software, Professional Services, or Deliverables from the date TeleTracking received notice of such defect from Client. To receive warranty remedies, Client must promptly notify TeleTracking in writing of any deficiencies no later than thirty (30) days after the first instance of any material non-conformance in the Subscription Service or Software, or thirty (30) days from the date that the Professional Services are completed.   Further, Client may also terminate the applicable Order Form or this Agreement, as set forth in Section 19, if such deficiencies cannot be corrected.

(e)    **DISCLAIMER.**  EXCEPT AS EXPRESSLY PROVIDED HEREIN AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, TELETRACKING MAKES NO WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, AND SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY WARRANTY ARISING BY STATUTE, OPERATION OF LAW, COURSE OF DEALING OR PERFORMANCE, OR USAGE OF TRADE, WITH RESPECT TO THE SUBSCRIPTION SERVICE, SOFTWARE, DOCUMENTATION, OR ANY PROFESSIONAL SERVICES, DELIVERABLES OR SUPPORT.  TELETRACKING DOES NOT WARRANT THAT THE SUBSCRIPTION SERVICE OR SOFTWARE WILL BE ERROR FREE OR UNINTERRUPTED.  THE LIMITED WARRANTIES PROVIDED HEREIN ARE THE SOLE AND EXCLUSIVE WARRANTIES PROVIDED TO CLIENT IN CONNECTION WITH THE PROVISION OF THE SUBSCRIPTION SERVICE, SOFTWARE, DOCUMENTATION, AND PROFESSIONAL SERVICES, DELIVERABLES, OR SUPPORT.

## TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT

(f)     **DISPLAY OF DATA DISCLAIMER, INDEMNIFICATION.** CLIENT IS SOLELY RESPONSIBLE FOR ENSURING PROPER HANDLING, USE, DISPLAY, AND DISCLOSURE OF PATIENT DATA AND PROTECTED HEALTH INFORMATION ("PHI") BY CLIENT AND ITS AUTHORIZED USERS USING THE SUBSCRIPTION SERVICE OR SOFTWARE IN ACCORDANCE WITH ALL APPLICABLE LAW. TELETRACKING DOES NOT ASSUME, AND EXPRESSLY DISCLAIMS, ANY RESPONSIBILITY FOR ANY ACTS OR OMISSIONS OF CLIENT AND ITS AUTHORIZED USERS OR OTHER PERSONNEL, NOT WITHIN TELETRACKING'S CONTROL, OR FOR ANY CUSTOM INSTRUCTIONS OR DIRECTION FROM CLIENT TO TELETRACKING WHICH RESULT IN ANY CLAIMS, COSTS, DAMAGES, LOSSES, LIABILITIES OR EXPENSES, INCLUDING ATTORNEYS' FEES AND COSTS, (HEREINAFTER COLLECTIVELY "DATA CLAIMS") ARISING OUT OF ANY BREACH, OR CLAIMED BREACH, OF CLIENT'S DUTIES OR OBLIGATIONS WITH RESPECT TO THE PROPER HANDLING, USE, DISPLAY, OR DISCLOSURE OF PATIENT DATA AND PHI, AND CLIENT HEREBY AGREES TO INDEMNIFY, DEFEND AND HOLD HARMLESS TELETRACKING, AND ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, ATTORNEYS, AGENTS, SUBCONTRACTORS, SUPPLIERS, AND CHANNEL PARTNERS (EACH A "TELETRACKING INDEMNIFIED PARTY"), AGAINST ANY DATA CLAIMS, TO THE EXTENT ARISING DIRECTLY OUT OF ANY BREACH, OR CLAIMED BREACH, OF CLIENT'S DUTIES OR OBLIGATIONS WITH RESPECT TO THE PROPER HANDLING, USE, DISPLAY, OR DISCLOSURE OF PATIENT DATA AND PHI, WHETHER ARISING OUT OF CONTRACT, TORT, REGULATORY OR STATUTORY CAUSES OF ACTION.

(g)     **PROFESSIONAL RESPONSIBILITY DISCLAIMER, INDEMNIFICATION.** THE SUBSCRIPTION SERVICE OR SOFTWARE ARE INTENDED AS A SUPPLEMENT TO, AND NOT A SUBSTITUTE FOR, THE KNOWLEDGE, EXPERTISE, SKILL, AND JUDGMENT OF PHYSICIANS, NURSES, PHARMACISTS, OR OTHER HEALTHCARE PROFESSIONALS, IN PATIENT CARE.   CLIENT ACKNOWLEDGES THAT TELETRACKING IS NOT A HEALTHCARE PROVIDER AND THAT THE PROFESSIONAL DUTY TO A PATIENT IN PROVIDING HEALTHCARE SERVICES LIES SOLELY WITH THE HEALTHCARE PROFESSIONAL PROVIDING PATIENT CARE SERVICES TO A PATIENT. CLIENT IS SOLELY RESPONSIBLE FOR THE USE OF INFORMATION PROVIDED BY THE SUBSCRIPTION SERVICE OR SOFTWARE WITH REGARD TO PATIENT CARE AND LOCATION AND CLIENT ACKNOWLEDGES THAT THE USE OF THE SUBSCRIPTION SERVICE OR SOFTWARE IS IN NO WAY INTENDED TO REPLACE OR SUBSTITUTE FOR THE PROFESSIONAL JUDGMENT OF CLIENT OR ITS AUTHORIZED USERS OR OTHER PERSONNEL.   TELETRACKING DOES NOT ASSUME AND EXPRESLY DISCLAIMS ANY RESPONSIBILITY FOR ACTS OR OMISSIONS OF CLIENT OR ITS AUTHORIZED USERS OR OTHER PERSONNEL, NOT WITHIN TELETRACKING'S CONTROL, WHICH MAY RESULT IN ANY LIABILITY OR DAMAGES RELATING TO PATIENT CARE OR HARM, INCLUDING, WITHOUT LIMITATION, ANY LIABILITY OR DAMAGES DUE TO MALPRACTICE, FAILURE TO WARN, NEGLIGENCE OR ANY OTHER BASIS, AND CLIENT HEREBY AGREES TO INDEMNIFY, DEFEND AND HOLD HARMLESS ANY TELETRACKING INDEMNIFIED PARTY AGAINST ANY CLAIMS ARISING OUT OF, OR RELATED TO, ANY SUCH LIABILITY OR DAMAGES, WHETHER ARISING OUT OF CONTRACT, TORT, REGULATORY OR STATUTORY CAUSES OF ACTION.

(h)     **INTEGRATION WARRANTY / DISCLAIMER.** Client warrants that TeleTracking is permitted to integrate the Subscription Service or Software with any and all systems that Client authorizes under this Agreement or applicable Order Form or SOW hereunder, including, but not limited, to Client's Admit Discharge Transfer (ADT), Electronic Medical Record (EMR) or Electronic Health Record (EHR) providers' systems. TELETRACKING EXPRESSLY DISCLAIMS ANY RESPONSIBILITY FOR ANY DELAY, FAILURE OR CLAIM ARISING OUT OF OR RELATING TO THE SUBSCRIPTION SERVICE, SOFTWARE, DOCUMENTATION, PROFESSIONAL SERVICES, DELIVERABLES OR SUPPORT FOR THE SUBSCRIPTION SERVICE OR SOFTWARE BASED UPON A LACK OF COOPERATION OR INSUFFICIENT COOPERATION FROM CLIENT OR ANY THIRD PARTY, NOT WITHIN TELETRACKING'S CONTROL, INCLUDING CLIENT'S ADT, EMR, OR EHR PROVIDER.

17.     <u>Indemnification</u>.

(a)     **Indemnification by TeleTracking.** TeleTracking will defend, indemnify and hold Client and its officers, directors, employees, or agents ("Client Indemnified Party") harmless against any loss, damage or costs (including reasonable attorneys' fees) in connection with claims, demands, suits, or proceedings ("Claims") made or brought by a third party alleging that the use of the Subscription Service, Software, or Deliverables as contemplated hereunder infringes a copyright, a United States, United Kingdom, or Canadian patent, or a trademark of a third party, or misappropriates a third party's trade secrets; provided, however, that Client: (a) promptly gives written notice of the Claim to TeleTracking; (b) gives TeleTracking sole control of the defense and settlement of the Claim (provided that TeleTracking may not settle any Claim unless it unconditionally releases Client of all liability); and (c) provides to TeleTracking, at TeleTracking's cost, all reasonable assistance. TeleTracking will not be required to indemnify Client if, and to the extent, the Claim arises from: (w) unauthorized modification of the Subscription Service, Software, or Deliverables by Client or its Authorized Users or other personnel in conflict with Client's obligations or as a result of any prohibited activity as set forth herein; (x) use of the Subscription Service, Software, or Deliverables in a manner inconsistent with the applicable Documentation; (y) use of the Subscription Service, Software, or Deliverables in combination with any other product or service not provided or authorized by TeleTracking; or (z) Client Materials or content provided by Client for use with the Subscription Service, Software, or Deliverables. If Client is enjoined from using the Subscription Service, Software, or Deliverables, or TeleTracking reasonably believes it will be enjoined, TeleTracking will have the right, at its sole option, to obtain for Client the right to continue use of the applicable Subscription Service, Software, or Deliverables, or to

## TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT

replace or modify the applicable Subscription Service, Software, or Deliverables so that it is no longer infringing, provided that they remain at least functionally equivalent. If neither of the foregoing options is reasonably available to TeleTracking, then use of the applicable Subscription Service, Software, or Deliverables may be terminated at the option of TeleTracking and TeleTracking's sole liability will be to refund any prepaid fees for the applicable Deliverables or the Subscription Service or Software associated with the unused portion of the Subscription Term or non-perpetual License Term, or for a perpetual License Term, a pro-rated portion of the License Fee paid for the applicable Software depreciated on a five year straight-line basis and the unused portion of any prepaid Support Fees associated with the Software.

**(b)**     **Indemnification by Client.** Client will defend, indemnify and hold harmless any TeleTracking Indemnified Party from any Claims made or brought by a third party alleging that the Client Data or Client Materials infringe the rights of, or caused harm to, a third party or violates any Law; provided, however, that TeleTracking: (a) promptly gives written notice of the Claim to Client; (b) gives Client sole control of the defense and settlement of the Claim (provided that Client may not settle any Claim unless it unconditionally releases TeleTracking of all liability); and (c) provides to Client, at Client's cost, all reasonable assistance.

**18.**     **Limitation of Liability.**

**(a)**     **Limitation of Liability.** TO THE MAXIMUM EXTENT PERMITTED BY LAW, AND EXCEPT WITH RESPECT TO EITHER PARTY'S INDEMNIFICATION OBLIGATIONS, EITHER PARTY'S OBLIGATIONS REGARDING THE OTHER PARTY'S CONFIDENTIAL INFORMATION OR PROPRIETARY RIGHTS, EITHER PARTY'S NEGLIGENCE, WILLFUL MISCONDUCT, OR CLIENT'S PAYMENT OBLIGATIONS, IN NO EVENT WILL EITHER PARTY'S (OR THEIR AFFLIATES', OFFICERS', DIRECTORS', EMPLOYEES', OR AGENTS') AGGREGATE LIABILITY ARISING OUT OF, OR RELATED TO, THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE, EXCEED THE FEES ACTUALLY PAID BY CLIENT IN CONSIDERATION FOR TELETRACKING'S SUBSCRIPTION SERVICE, SOFTWARE, PROFESSIONAL SERVICES, OR SUPPORT THAT GAVE RISE TO SUCH LIABILITY DURING THE PRECEDING SIXTY MONTH PERIOD FROM THE DATE SUCH CLAIM OR CAUSE OF ACTION AROSE.

**(b)**     **Exclusion of Damages.** IN NO EVENT WILL EITHER PARTY HAVE ANY LIABILITY TO THE OTHER PARTY FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, HOWEVER CAUSED, OR FOR ANY LOST PROFITS OR LOSS OF USE, WHETHER IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF, OR IN ANY WAY CONNECTED WITH, THE SUBSCRIPTION SERVICE OR SOFTWARE, INCLUDING, BUT NOT LIMITED TO, THE USE OR INABILITY TO USE, THE SUBSCRIPTION SERVICE OR SOFTWARE, OR ANY INTERRUPTION, INACCURACY, ERROR OR OMISSION, RELATED THERETO, EVEN IF THE PARTY FROM WHICH DAMAGES ARE BEING SOUGHT OR SUCH PARTY'S AFFLIATES, OFFICERS, DIRECTORS, EMPLOYEES, OR AGENTS HAVE BEEN PREVIOUSLY ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGES.

**19.**     **Term & Termination.**

**(a)**     **Term of TeleTracking Subscription and License Agreement.** The term of this TSLA commences on the Effective Date and continues until the later of five (5) years or the expiration or termination of all Order Forms and SOWs, unless terminated earlier as set forth in this Agreement. Thereafter, this TSLA may be renewed by mutual written agreement of the parties (the initial term and any renewal term being the "Term" of this TSLA).

**(b)**     **Subscription Term, License Term.** If TeleTracking Products are not purchased through a Reseller: any subscription to the Subscription Service or license to the Software shall commence on the Start Date for the applicable Subscription Service or Software, and shall continue for the period set forth in the applicable Order Form for such Subscription Service or Software (each respectively, a "Subscription Term" or "License Term"). Thereafter, the Subscription Term for the applicable Subscription Service or non-perpetual License Term for the applicable Software may be extended for a successive renewal term as set forth in subsequent Order Forms. If Client has not signed and delivered a subsequent Order Form to TeleTracking regarding an upcoming renewal term prior to the expiration of the then-current Subscription Term or License Term, then the Subscription Term for the applicable Subscription Service or License Term for the applicable Software shall be automatically renewed for successive renewal terms of one (1) year each at TeleTracking's then-standard fees, unless either party provides written notice of non-renewal to the other at least sixty (60) days before such expiration.

**(c)**     **Support Term.** If TeleTracking Products are not purchased through a Reseller: the support term for the Subscription Service or Software shall commence with the Subscription Term or License Term and remain coterminous with the applicable Subscription Term or non-perpetual License Term, and, for any perpetual License Term, shall continue for the initial support term set forth in the applicable Order Form and any renewal term thereof ("Support Term"). The Support Term for any perpetual License Term may be renewed after each Support Term for successive renewal Support Terms of one (1) year upon payment by Client of a renewal invoice, or this Agreement is otherwise terminated in accordance with the terms of the Agreement. If Client wishes to terminate the Support Term, Client shall provide TeleTracking with termination notice no more than thirty (30) days after the

## TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT

expiration of the then-current Support Term. Client may elect to reinstate a Support Term for Software with a perpetual License Term, provided that Client pays the Support Fees associated with the period of any lapsed Support.

(d)  **Coterminous Subscription Service and Software.** Client acknowledges that the functionality of certain Subscription Service and Software may require implementation and integration with other Subscription Service and Software of TeleTracking and, in the event that Client desires to procure such Subscription Service and Software, the applicable Subscription Term or License Term for such Subscription Service and Software will be set forth as coterminous in an Order Form for such Subscription Service and Software.

(e)  **Termination.** If TeleTracking Products are not purchased through a Reseller: either party may terminate this Agreement or an Order Form: (i) upon thirty (30) days' prior written notice to the other party of a breach of a material breach by the other party if such breach remains uncured at the expiration of such notice period; or (ii) immediately in the event the other party becomes the subject of a petition in bankruptcy or any other proceeding relating to insolvency, receivership, liquidation or assignment for the benefit of creditors. In such event, and upon Client's request, TeleTracking will refund the unused portion of any prepaid Support Fees associated with perpetually licensed Software. Client may, upon one hundred and twenty (120) days' written notice, terminate this Agreement or an Order Form for convenience. Upon such termination for convenience, Client will pay to TeleTracking all fees due under the Agreement and each Order Form for any remaining Subscription Term, License Term, and Support Term of each Subscription Service and Software. Termination of this Agreement shall not be effective as to any (i) Order Form still in effect unless the Order Form is also expressly terminated in writing, or (ii) Client Affiliate that has executed an Order Form pursuant to this Agreement unless the Order Form is also expressly terminated in writing by the applicable Client Affiliate. Further, the parties agree that Client may migrate the software and services that are the subject of this Agreement to a future agreement between TeleTracking and Client, and in doing so, Client may terminate this Agreement without penalty and without having to meet the above-mentioned notice requirement.

(f)  **Effect of Termination.** Upon any termination of any Order Form under this Agreement or order through a Reseller, Client will, unless otherwise mutually agreed upon, as of the date of such termination, immediately cease accessing and otherwise using the applicable Subscription Service, Software, Documentation and TeleTracking Confidential Information, and de-install and delete all applicable Software and Documentation from all Client servers and computing devices, and destroy any media copies of the Software and tangible copies of Documentation and TeleTracking Confidential Information in the possession or control of Client. Upon written request of TeleTracking, Client will provide written certification to TeleTracking of Client's compliance with this provision. Termination for any reason will not relieve Client of the obligation to pay any fees accrued or due and payable to TeleTracking prior to the effective date of termination.

(g)  **Retrieval of Client Data.** From the date of any expiration or termination of an applicable Order Form or order through a Reseller, TeleTracking grants Client thirty (30) days of limited, read-only access to the Subscription Service, solely for the purpose of Client retrieving Client Data, or if requested by Client, TeleTracking will provide Client with a database extract of Client Data on a time and materials basis at TeleTracking's then-standard rates for such services. After such thirty (30) day period, TeleTracking will have no obligation to maintain or provide any Client Data and may thereafter, unless legally prohibited and subject to any data retention obligations imposed on TeleTracking by Law, delete all Client Data.

(h)  **Surviving Provisions.** All provisions of this Agreement which, by their express terms or nature, survive termination, will continue thereafter until fully performed, including, but not limited to, Section 13 (Proprietary Rights), Section 14 (Confidentiality Obligations), and Section 18 (Limitation of Liability).

20.  **General Provisions.**

(a)  **Order Form.** All Order Forms between TeleTracking and Client shall be deemed part of, and subject to, this Agreement for the applicable Subscription Term, License Term, or Support Term set forth in such Order Form.

(b)  **Relational Commitment.** Upon written request of the other party, but no more than once annually, each party agrees to make available an applicable C-level senior leadership member of the party to meet in person with an applicable C-level senior leadership member of the other party within thirty (30) days of such request, or at such time as otherwise mutually scheduled, for a review of the parties' business relationship and any Subscription Service and Software implemented or otherwise available under this Agreement.

(c)  **Relationship of the Parties.** The parties are independent contractors. This Agreement does not create, nor is it intended to create, a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the parties. There are no third-party beneficiaries to this Agreement.

## TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT

(d) **Publicity.** Neither party will use the name or logos of the other party in publicity, advertising, or similar activity, without the prior written consent of the other party, except that Client hereby consents to TeleTracking's use of Client's name as a customer of TeleTracking.

(e) **Notices.** All legal notices under this Agreement will be in writing, signed by the party delivering such notice, and delivered by overnight courier, or prepaid, first class, certified mail, return receipt requested.

    (i)    Notices to TeleTracking hereunder shall be sent to TeleTracking's address set forth in the introductory paragraph of this Agreement to the attention of Executive VP and CFO with a copy by email to legal-notices@teletracking.com.

    (ii)    Notices to Client hereunder shall be sent to: Orlando Health, 1414 Kuhl Avenue, MP 860, Orlando, FL 32806, Attn: Vice President/Chief Information Officer

          With a copy to: Orlando Health, Inc., 1414 Kuhl Avenue, Mail Point 860, Orlando, Florida 32806,    Attn: Senior Counsel, I.S.

    (iii)    Notices to a Client Affiliate hereunder shall be sent to the Client Affiliate address set forth on the applicable Order Form to the attention of the Client Affiliate representative listed on the signature line of the Order Form.

Any party may modify its recipient of notices, or addresses therefor, by providing written notice pursuant to this section. For clarity, legal notices include, but are not limited to, formal notices from one party to the other regarding an alleged breach of any provision of this Agreement, a party's intention to terminate this Agreement, any indemnification obligations, and any warranty claims or notices of non-conformity with regard to the Subscription Service, Software, Documentation, Support, or Professional Services provided hereunder. The parties may provide other forms of communication (other than legal notices regarding this Agreement) in accordance with this Agreement through e-mail, mail, overnight courier, or posting on the Subscription Service by TeleTracking.

(f) **Waiver and Cumulative Remedies.** No failure or delay by either party in exercising any right under this Agreement will constitute a waiver of that right or any other right. Other than as expressly stated herein, the remedies provided herein are in addition to, and not exclusive of, any other remedies of a party at law or in equity.

(g) **Force Majeure.** Neither party will be liable for any failure or delay in performance under this Agreement (other than for delay in the payment of money due and payable hereunder) for causes beyond that party's reasonable control and occurring without that party's fault or negligence, including, but not limited to, acts of God, acts of government, flood, fire, civil unrest, acts of terror, strikes or other labor problems (other than those involving TeleTracking or Client employees, respectively), or, where TeleTracking is in compliance with its security and backup obligations under this Agreement, computer attacks or malicious acts, such as attacks on or through the Internet, any Internet service provider, telecommunications provider, mobile device, or hosting facility. Dates by which performance obligations are scheduled to be met will extend for a period of time equal to the time lost due to any delay so caused. If such event occurs unabated for a period of thirty (30) days or longer, the party not claiming the excuse may terminate this Agreement upon five (5) day's written notice to the other party.

(h) **Assignment.** Neither party may assign any of its rights or obligations hereunder, whether by operation of law or otherwise, without the prior written consent of the other party (which consent will not be unreasonably withheld, conditioned, or delayed); provided, however, that either party may assign or transfer this Agreement upon written notification to the other party, to any third party which acquires all or substantially all of such party's stock or assets to which this Agreement pertains, whether by merger, reorganization, acquisition, sale or otherwise, so long as the surviving party in such transaction is not a competitor of the other party and is financially and otherwise capable of performing its obligations under this Agreement. The terms and conditions of this Agreement will survive any buyout of either TeleTracking's company or software sold to another company. Subject to the foregoing, this Agreement will bind and inure to the benefit of the parties, their respective successors and permitted assigns.

(i) **Governing Law.** This Agreement will be governed exclusively by the internal laws of the State of Florida, without regard to its conflicts of law rules. The International convention for the sale of goods, and Uniform Computer Information Transactions Act shall not apply to this Agreement.

(j) **U.S. Government Restricted Rights.** This provision applies to any Client operating on behalf of any part of the United States Government. The Subscription Service or Software, including the related Documentation, are provided with restricted rights.

## TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT

The Subscription Service, Software, and Documentation are deemed to be "commercial software" and "commercial software documentation," respectively, pursuant to DFAR Section 227.7202 and FAR 122.212, as applicable. Any use, modification, reproduction, release, performance, display or disclosure of the Subscription Service or Software, including related documentation by the U.S. Government or any of its agencies shall be governed solely by the terms of the license rights granted by this Agreement and shall be prohibited except to the extent expressly permitted by the terms of the license rights granted by this Agreement.

(k)     **Export.** Each party will comply with the export laws and regulations of the United States and other applicable jurisdictions in providing and using the Subscription Service or Software. Without limiting the generality of the foregoing, Client will not make the Subscription Service or Software available to any person or entity that: (i) is located in a country that is subject to a U.S. government embargo; (ii) is listed on any U.S. government list of prohibited or restricted parties; or (iii) is engaged in activities directly or indirectly related to the proliferation of weapons of mass destruction.

(l)     **Anti-Fraud.** TeleTracking warrants that, as of the time of the execution and during the performance of this Agreement, neither it nor any of its directors, officers, employees, agents, or subcontractors ("Persons") (1) is currently excluded, suspended, debarred or otherwise ineligible to participate in federal healthcare programs, or (2) has been convicted of a criminal offense related to the provision of health care items or services and has not been reinstated in the federal health care programs after a period of exclusion, suspension, debarred or otherwise ineligibility. TeleTracking agrees to notify Client if the above specified Persons ever become excluded, suspended, debarred or otherwise ineligible to participate in federal healthcare programs. Notwithstanding any notice and cure provisions to the contrary, TeleTracking agrees to indemnify, hold harmless and defend Client from any and all third party claims, demands which Client may suffer as a direct result of TeleTracking's breach.

(m)     **Equal Opportunity Employer.** TeleTracking is an equal opportunity employer and does not discriminate on the basis of race, sex, color, religion, creed, ancestry, national origin, disability, age, marital status, sexual orientation, or other protected class status pursuant to applicable law. TeleTracking does not reject employees, or otherwise deem employees unacceptable, or take any other action, for any reason prohibited by federal, state or local Law, including, but not limited to, laws pertaining to employment discrimination or employee safety.

(n)     **Interpretation.** For purposes of this Agreement, (a) the words "include," "includes," and "including" will be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole; and (d) words importing singular expression include the plural and words importing gender include all genders. Unless the context otherwise requires, references herein: (i) to Subscription Service or Software refer to the applicable Subscription Service or Software that is the subject of an Order Form which has not expired or otherwise been terminated in accordance with this Agreement; (ii) to Designated Facility or Designated Area refer to the applicable Designated Facility or Designated Area identified in the applicable Order Form, (iii) to sections and exhibits refer to the sections of, and exhibits attached to, this Agreement; (iv) to the Agreement, Order Form, Statement of Work, or other document means such Agreement, Order Form, Statement of Work, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions hereof; and (v) to a Law means such Law as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement will be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing an instrument to be drafted. The headings in this Agreement are for reference only and will not affect the interpretation of this Agreement.

(o)     **Miscellaneous.** This Agreement, including all amendments, exhibits, attachments, Order Forms and SOWs hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof. In the event of a conflict, the provisions of this TSLA will take precedence over an Order Form or SOW or other exhibit or attachment hereto, unless the conflicting provision of the Order Form or SOW or other exhibit or attachment hereto expressly states that it is intended to prevail. This Agreement supersedes all prior and contemporaneous agreements, proposals or representations, written or oral, concerning its subject matter. No modification, amendment, or waiver of any provision of this Agreement will be effective unless in writing and signed by the party against whom the modification, amendment or waiver is to be asserted. If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, the provision will be modified by the court and interpreted so as best to accomplish the objectives of the original provision to the fullest extent permitted by law, and the remaining provisions of this Agreement will remain in effect. This Agreement, and any Order Form or SOW hereto, may be executed in counterparts, which, taken together, will form one binding legal instrument. The parties hereby consent to the use of electronic signatures in connection with the execution of this agreement, and further agree that electronic signatures to this Agreement will be legally binding with the same force and effect as manually executed signatures.

## TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT

**(p)**    **Right of Client to Reject TeleTracking Employee(s).** Client shall have the right to reasonably reject without penalty any TeleTracking employee(s) (a) whose qualifications or performance, in Client's good faith and reasonable judgment, do not meet the standards established by Client as necessary for the performance of the Services, or (b) who fail to comply with the policies and procedures of Client. TeleTracking shall be provided written notice of such rejection and ten (10) days from the receipt thereof to find a suitable replacement for employee; provided, however, that Client shall first attempt to confer with TeleTracking regarding any issues or problems concerning such TeleTracking employee(s). In the event Client rejects any TeleTracking employee under this section, Client shall be liable only for work performed up to the date of notification and TeleTracking shall promptly provide a replacement acceptable to Client, having appropriate qualifications and experience, so as to provide efficient transition to the replacement personnel, at no additional cost to Client. Client will then pay for all work performed by the acceptable replacement employee in accordance with the applicable Order Form or statement of work. Notwithstanding the forgoing, TeleTracking shall perform any re-work required as a result of defects in performance by the replaced employee, at no additional cost to Client, to ensure a successful implementation.

**(q)**    **Medicare Cost Certification.** To the extent applicable and as required by law, upon the written request of the Secretary of Health and Human Services, the Comptroller General, or their duly authorized representatives, TeleTracking shall make available the Agreement, and the books, documents, and records (collectively, the "Records") of TeleTracking that are necessary to certify the nature and extent of costs of the services incurred by Client pursuant to this Agreement. The Records shall be available until the expiration of four years after the furnishing of Products or Services. If required by law, TeleTracking shall have a similar provision in all subcontracts with a value or cost totaling $10,000 or more over a twelve (12) month period, if any, for a subcontractor providing services to Client under this Agreement. TeleTracking agrees to promptly notify Client of any requests it receives for access to TeleTracking's records and a copy of such notice.

**(r)**    **Third Party Beneficiaries.** TeleTracking's licensors, suppliers, and subcontractors shall not be third party beneficiaries under this Agreement.

**(s)**    **Insurance.** If applicable, TeleTracking shall include proof of appropriate product liability insurance. TeleTracking agrees to provide Client with a certificate of insurance evidencing the coverage required hereunder and further agrees to provide Client with written notice of any change in coverage that effectively results in a reduction of the coverage that was in effect as of the effective date of this Agreement. TeleTracking shall provide at its own expense, insurance to cover Worker's Compensation, Professional Liability, Employer's Liability, Contractor's Public Liability, and general property insurance for goods and/or services provided. The minimum amount of coverage is as follows:

**A.**    Worker's Compensation by statute.

**B.**    Employer's Liability of at least $100,000 per person.

**C.**    General Liability - Must be $1,000,000 per occurrence, $3,000,000 aggregate.

**D.**    Contractual Bodily Injury and Property Damage Liability Insurance in an amount no less than $2,000,000 per occurrence.

**E.**    Must carry Professional Liability of $2,000,000 per occurrence, $5,000,000 aggregate (if TeleTracking comes in contact with patients in any professional capacity requiring such insurance).

TeleTracking shall, promptly following written request, provide Client with a Certificate of Insurance evidencing such coverage.

**(t)**    **Sunsetting of product.** In the event TeleTracking releases a new software product resulting in the sunsetting of an existing product procured by Client under this Agreement, TeleTracking will not degrade its support practices during the then current Support Term for the existing program. During the Support Term: (1) TeleTracking will provide support for the then existing product release for at least twenty-four (24) months after general availability for that release, and (2) TeleTracking will alert Client at least eighteen (18) months before the scheduled termination of support and the product warranty for any version of the Software then in use by Client. In the event that TeleTracking releases a new product that is intended to fully replace an existing product that Client has perpetually licensed, and no longer provides support for the existing product, Client will receive a credit toward the purchase of such new product equal to a pro-rated portion of the License Fee paid for the applicable Software depreciated on a five year straight-line basis from the Start Date of such Software and the unused portion of any prepaid Support Fees associated with the Software.

**(u) Disaster Recovery.** For Subscription Services, TeleTracking agrees to create a system failover test plan, test the system failover, ensure that the failover process is functional and lead the remediation effort if the failover does not work properly. A separate agreement may be executed between TeleTracking and Client to provide assistance in an advisory role to develop and

## TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT

test a disaster recovery plan that defines the steps required to be performed by Client to recover the system and return to full functionality after a system crash that includes development of a downtime policy and procedure to ensure Client is able to properly enter the data that occurred manually (during the downtime) back into the system to restore the system to full functionality. Client is responsible for all disaster recovery plans and processes for all Software and systems under its control.

**(v) Non-solicitation.** Each party shall refrain from soliciting for employment or employing directly or indirectly, any employee of the other until twelve (12) months have elapsed following termination of this Agreement without prior written consent of the other party. The foregoing shall not prohibit employees of either party from responding to general advertisements for employment published by the other party provided such advertisements are not offered directly or individually to an employee of a party by the other party.

**(w) Dispute Resolution.** The parties agree that prior to any dispute being submitted to the courts, the parties, in an effort to settle their dispute, will participate in good faith mediation in conformance with applicable Florida law before a mutually agreeable qualified Florida mediator. If the parties are unable to settle their dispute through mediation, the parties may then submit the claim or controversy to the courts of Florida.

IN WITNESS WHEREOF, the parties' authorized signatories have duly executed this Agreement.

**TELETRACKING TECHNOLOGIES, INC.**

Signature: _____

Name: _Mike Caffrey_

Title: _EVP/CFO_

Date: _4/4/17_

**ORLANDO HEALTH, INC.**

Signature: _John R. Schooler_
FB8B6D3714A34AE...

Name: _John R. Schooler_

Title: _VP & CIO_

Date: _April 3, 2017_

REVIEWED BY TELETRACKING
LEGAL COUNSEL & RECOMMENDED
FOR SIGNATURE _DJL 4/3/17_

DocuSign Envelope ID: B848B094-5A35-434C-BE5!        95E4F86B0

## TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT

**EXHIBIT A**

**TELETRACKING SUPPORT AND MAINTENANCE POLICY**

[Document to follow this cover page]

## TELETRACKING SUPPORT AND MAINTENANCE POLICY

This document communicates TeleTracking's Support and Maintenance Policy ("Support Policy") with its clients provided that client is in compliance with the TeleTracking Subscription and License Agreement or other governing license or subscription agreement, as applicable (the "TSLA") for the subscription service or software covered by this Support Policy, and is otherwise current on all applicable subscription, license, and support fees therefor. As used in this Support Policy, Subscription Service and Software refer to the subscription service or software procured by client under the TSLA, and client refers to the client or client affiliate that has procured the applicable Subscription Service or Software under the TSLA, as applicable.

1.    **Technical Support:**

(a)    <u>Telephone Support</u>.  TeleTracking will maintain help desk support  to receive technical support requests for the Subscription Service and Software by toll-free telephone call 24 hours per day, seven (7) days per week, 365 days per year during the subscription or license term for the applicable Subscription Service or Software in accordance with this Support Policy provided that TeleTracking is afforded remote access to any Software at the client facility or installation site that is necessary to provide such support.

(b)    <u>Technical Support Scope</u>.  TeleTracking provides standard technical support sufficient to keep the Subscription Service and Software functioning in conformance with the applicable TeleTracking documentation.  Standard technical support includes updates, upgrades, defect corrections, bug fixes, and other improvements to the Subscription Service and Software; provided, however, that routine upgrades and updates requested by client outside of normal office hours, 8 am to 11 pm (Eastern Standard Time), Monday through Friday, may be subject to additional fees.  Upgrades and updates to the Subscription Service or Software do not include the provision by TeleTracking of any new or subsequent Platform to client, which may be subject to a separate subscription fee or license fee chargeable to client. TeleTracking provides standard technical support for Software for the current version of the Software and the two preceding versions thereto.  TeleTracking provides extended support and sunset support levels for prior Software versions based on the current life cycle status of the applicable Software.  Extended support includes troubleshooting, "how-to," and configuration support for the Software.  No further enhancements or minor defect fixes are offered, but hotfixes or patches may be provided for critical defects, typically via an update to the current version of the Software.  Sunset support includes troubleshooting, "how-to," and configuration support for the application but no further enhancements or defect fixes/corrections are offered.   All Software support is discontinued upon retirement of the Software.

(c)    <u>On-site Technical Support</u>.  On-site technical support of the Subscription Service and Software will be scheduled at a mutually convenient time if TeleTracking's remote efforts to support the Subscription Service and Software fail.  Client will incur no additional costs for TeleTracking Subscription Service or Software problems, errors or malfunctions, which are identified and remedied during any on-site support visit and mutually determined to be the fault of TeleTracking.  Client shall be responsible for paying TeleTracking's then prevailing hourly rate plus reimbursement of reasonable and necessary travel expenses for TeleTracking Subscription Service and Software problems, errors or malfunctions, which are mutually determined to be the result of an error or some other fault of client or the support obligations of client as pertains to third party software and third party hardware.

1

## TELETRACKING SUPPORT AND MAINTENANCE POLICY

(d)    Integration Services and Support. TeleTracking provides remote implementation services and support of one or more available interfaces between the Subscription Service, Software, and other systems within a client's infrastructure (each an "Integration Point" or, collectively, "Integration Points.") Integration Points currently offered by TeleTracking are listed as part of its TeleConnect™ Integration Solutions document located at http://go.teletracking.com/tsla/tele-connect (or successor site), as may be amended from time to time in TeleTracking's sole discretion. Integration Points will be made available to client and implemented by TeleTracking in accordance with the particular integration package purchased by client for the applicable Subscription Service or Software and any specific delivery requirements set forth in an applicable statement of work. TeleTracking provides interface support for the current version of the applicable Software and the two preceding versions thereto. Reconfiguration of Integration Points already implemented, as well as custom interfaces and implementation services not within the standard Integration Point delivery requirements are subject to additional fees.

(e)    Computer-Based Training and Support. Support in the general use and operation of the TeleTracking Subscription Service and Software is provided during the applicable subscription term or license term at no additional charge through on-line computer-based training modules made available to client. Additional training, support, and consultation is available to client as professional services at TeleTracking's current rates.

(f)    Non-Production System. TeleTracking will provide support for any non-production system provided by TeleTracking between the hours of 8 am and 11 pm (Eastern Standard Time), Monday through Friday; provided, however, that TeleTracking support for any incident involving a client's production use of the Subscription Service and Software shall take priority over any incident involving a non-production system. After hours / weekend support of any non-production system is subject to additional service charges.

(g)    Backup of Software. Client is responsible for the backup and archiving of all Software databases and logs, including the management logs on the application servers.

(h)    Client Responsibilities. Client is responsible for performing any and all client network setup, management, or support activities including, but not limited to: (i) network security management, (ii) LAN and WAN design or component installation (other than application server and peripherals), (iii) Windows Domain management, (iv) client applications authentication/access control (i.e. Windows Domain, Active Directory, Novell eDirectory), (v) desktop and server remote management solutions, (vi) Web server management and deployment, (vii) database server management and deployment, (viii) server based computing environments (e.g., Citrix), (ix) virus protections software and maintenance, and (x) operating system upgrades/patches.

(i)    Third Party Software. Client is responsible for supplying all third party software not provided by TeleTracking as part of the Subscription Service or Software, which meets the technical specifications set forth in the applicable TeleTracking documentation. Client is responsible for support and maintenance of third party software, including third party software upgrades to the extent required to permit TeleTracking to provide Subscription Service and Software updates and upgrades.

(j)    Third Party Hardware and Equipment. Client is responsible for supplying all third party hardware not provided by TeleTracking as part of the Subscription Service or Software, which meets the technical specifications set forth in the applicable TeleTracking documentation including Real-Time Locating System

## TELETRACKING SUPPORT AND MAINTENANCE POLICY

(RTLS) hardware and equipment that is compatible with the TeleTracking Subscription Service and Software if not otherwise supplied by TeleTracking. Client is responsible for support and maintenance of third party hardware, including third party hardware upgrades and maintenance to the extent required to permit TeleTracking to provide Subscription Service and Software updates and upgrades.

(k)    <u>Support Cooperation</u>. TeleTracking and client must use their best efforts to cooperate with each other in furtherance of the support obligations stated herein, and to collaborate diligently and in good faith with regard to establishing a remote management solution to allow remote support of the TeleTracking Software in order for TeleTracking to comply with the support obligations set forth herein.

(l)    <u>Exclusions</u>. TeleTracking supports the Subscription Service and Software developed and provided by TeleTracking and under its control. For all other issues or errors in the TeleTracking Subscription Service or Software caused by issues, errors or changes in client's network, infrastructure, information systems or third party products or services, TeleTracking may assist client and its third party providers in diagnosing and resolving issues or errors but these matters are outside of TeleTracking's support obligations and may be subject to additional fees for professional services at TeleTracking's current rates. TeleTracking will not be required to resolve any support incident caused by (i) integration of any third party application or device to the Software or Subscription Service or any part thereof that is not provided by TeleTracking, or otherwise approved by TeleTracking or the applicable TeleTracking documentation; (ii) any non-conformance caused by unauthorized misuse, alteration, modification or enhancement of the Software or Subscription Service; or (iii) use of the Subscription Service or Software that is not in compliance with the TSLA. Any TeleTracking beta, early adopter, non-production, or other test version of the Subscription Service or Software, or other non-production system or environment, is also excluded from this Support Policy.

## 2. Incident Submittal and Reporting:

(a)    Any authorized user of client is permitted to submit incidents to TeleTracking's technical support group. However, TeleTracking requires that clients designate a TeleTracking application administrator and provide such individual's contact information to facilitate the most prompt and efficient support possible. A client's TeleTracking application administrator should evaluate the issue in the first instance to determine whether TeleTracking should be contacted, or if the issue is due to a local problem such as a PC failure, paging and telephony failure, or client network or server problem.

(b)    Authorized users may submit incidents to TeleTracking via TeleTracking's technical support telephone number. Each incident will be assigned a unique Incident ID number. TeleTracking will respond to each case in accordance with this Support Policy and will use commercially reasonable efforts to promptly resolve each case. Actual resolution time will depend on the nature of the incident and the resolution itself. A resolution may consist of a fix, workaround, delivery of information or other commercially reasonable solution to the issue.

(c)    After acknowledgement of an incident, TeleTracking will assign a Technical Support Engineer ("TSE") to manage the case. The TSE will contact the client with an incident response email or phone call to begin the process of resolving the client's request.

DocuSign Envelope ID: B848B094-5A35-434C-BE5    95E4F86B0

## TELETRACKING SUPPORT AND MAINTENANCE POLICY

(d)    No personally identifiable patient data or protected health information should ever be transmitted to TeleTracking technical support by email or other electronic transmission without the express written consent of TeleTracking.

### 3. Impact / Severity Level Determination:

Incidents are designated to have an impact or severity level ("Impact / Severity Level") mutually agreed upon by the client and TeleTracking Technical Support Engineer. The Impact / Severity Level shall be assigned on the basis of the TSE's understanding of the status of the Subscription Service or Software defined in the following table:

| Impact / Severity Level | System Status |
|---|---|
| 0 - Critical | A critical failure in the operation of the Subscription Service or Software where no workaround or bypass is immediately available. Circumvention and or resolution of the failure is required for operational use of the Subscription Service or Software to continue. |
| 1 - High | A severe problem, where an application is inoperative or seriously degraded. |
| 2 - Medium | A problem that limits the functionality or usefulness of an application, but the condition is not critical to the continued operation of the Subscription Service or Software. A workaround is readily available, and can be applied or used with little or no operation impact. The problem may only affect a single user or group of users and may not necessarily be a system-wide issue. |
| 3 - Low | A problem limits the functionality or usefulness of an application, but the condition is not critical to the continued operation of the Subscription Service or Software. A workaround is readily available, and can be applied or used with little or no operation impact. The problem may only affect a single user and is not a system-wide issue. |

The Impact / Severity Level for an incident may be revised by the TSE as a result of apparent changes in the status of the Subscription Service or Software. The client shall be promptly notified of all changes in the Impact / Severity Level of an open incident. In the event of a conflict regarding the appropriate Impact / Severity Level designation, each party shall promptly escalate such conflict to its management team for resolution through consultation between the parties' management, during which time the parties shall continue to handle the support issue in accordance with the TeleTracking Impact / Severity Level designation. In the rare case a conflict requires a management discussion, both parties shall be available within one hour of the escalation.

### 4. Support Incident Severity Levels - Response and Escalation:

(a)    Incident Response and Escalation Notification Matrix. Due to the complex nature of some incidents and need for client interaction, it is not possible to define absolute response times for all issues. The response times below reflect the time taken between a TSE logging a support call and raising an incident. These times can vary as a support call is sometimes logged and worked on while the caller is still on the phone. In these instances it is therefore not practical to raise an incident until after the call has been addressed.

| Impact / Severity Level | Notifications | | |
|---|---|---|---|
| | Response | Technical Support Manager | Technical Support Director |
| 0 - Critical | 1 hour | Immediate | 8 hours |

DocuSign Envelope ID: B848B094-5A35-434C-BE5      395E4F86B0

## TELETRACKING SUPPORT AND MAINTENANCE POLICY

| 1 - High | 2 hours | 4 hours | 16 hours |
|---|---|---|---|
| 2 - Medium | 8 hours | N/A | N/A |
| 3 - Low | 40 hours | N/A | N/A |

(b)  Restore and Resolve Objectives for Critical and High Level Impacts.

    (i)  The primary objective of the TeleTracking technical support team is to restore Subscription Service and Software when Critical and High Impact / Severity Level outages are reported. To restore the Subscription Service and Software means to return the Subscription Service and Software to a stable operating condition that existed prior to the incident.

    (ii)  The secondary objective of the TeleTracking technical support team is to identify the original reported problem and ultimately provide a resolution.  To resolve the incident means to implement some change in the Subscription Service or Software or procedures to prevent reoccurrence of the issue causing the incident. In some cases identifying the root cause of the original reported problem may not be possible as the actions taken to restore the system may clear the original reported problem. Resolution times are typically longer than restore times.

(c)  Client Commitment.  Due to the complex nature of some incidents and need for client interaction, a client commitment to restoring and resolving an incident is also important.  The client commitments below reflect the response and accessibility of client necessary to facilitate the most efficient and practical restoration and resolution of the incident based on the associated Impact / Severity Level of the incident.

| Impact / Severity Level | Client Commitment |
|---|---|
| 0 - Critical | Client will remain accessible by phone and ensure remote access is available for troubleshooting from the time the incident is logged until such time as the Subscription Service or Software is restored. |
| 1 - High | Client will remain accessible by phone and ensure remote access is available for troubleshooting from the time the incident is logged until such time as the Subscription Service or Software is restored. |
| 2 - Medium | Client will respond to TeleTracking requests for additional information and implement recommended solutions in a timely manner. |
| 3 - Low | Client will respond to TeleTracking requests for additional information and implement recommended solutions in a timely manner. |

TeleTracking's obligation to provide support under this Support Policy is conditioned upon the client (a) providing TeleTracking with all reasonable assistance and providing TeleTracking with remote access, data, information and materials as are reasonably necessary to provide the support; (b) maintaining all equipment, telephone lines, communication interfaces and other hardware and software necessary to use and access the Subscription Service and Software; and (c) providing appropriate contact information for all client personnel necessary to facilitate the support.

(d)  Incident Resolution and Closure.  TeleTracking shall attempt to meet the restore and resolution objectives specified in this Support Policy using commercially reasonable efforts and in accordance with the support processes described in this Support Policy.  An incident will be considered resolved and subsequently

## TELETRACKING SUPPORT AND MAINTENANCE POLICY

closed when it is mutually agreed between the client and TSE that the reported issue has been satisfactorily handled.  The resolution time is the time from when the incident was logged by TeleTracking, until the time that the client and the TeleTracking TSE agree to close the incident. TeleTracking may elect to close an open incident without mutual agreement if the client fails for 10 business days to acknowledge TeleTracking's request to close the incident, or fails to perform some reasonable request from TeleTracking to assist in handling the problem. The client will be promptly notified of all incident closures.

DocuSign Envelope ID: B848B094-5A35-434C-BE5    395E4F86B0

**TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT**

EXHIBIT B

SLA POLICY

[Document to follow this cover page]

# TELETRACKING SUBSCRIPTION SERVICE - SERVICE LEVEL AVAILABILITY POLICY

This document communicates TeleTracking's Subscription Service – Service Level Availability Policy ("SLA Policy") with its clients provided that client is in compliance with the TeleTracking Subscription and License Agreement or other governing subscription agreement (the "TSLA") for the subscription service covered by this SLA Policy, and is otherwise current on all applicable subscription fees therefor. As used in this SLA Policy, Subscription Service refers to the subscription service procured by client under the TSLA, and client refers to the client or client affiliate that has procured the applicable Subscription Service under the TSLA, as applicable.

1.  **Subscription Service - Service Level Availability:** TeleTracking's Service Level Availability target for the Subscription Service is **99.5%** uptime for each calendar month of the subscription term excluding regularly scheduled maintenance times.

(a)  Maintenance time is regularly scheduled if it is communicated in accordance with the notice requirement set forth below at least one (1) full business day in advance of the maintenance time. Notices of regularly scheduled maintenance will be sufficient if provided to a client's TeleTracking application administrator or other Authorized User designated as an administrator of the Subscription Service either: (a) by email to the registered email address provided for client's TeleTracking application administrator or other administrator(s) of the Subscription Service; or (b) as a message on the log in screen for the Subscription Service. TeleTracking also provides notice that every Saturday night from 10:00 pm to 12:00 am Sunday morning Eastern Standard Time (US) is reserved for routine scheduled maintenance as needed.

(b)  Service level failures attributable to (i) client's acts or omissions; (ii) support provided by TeleTracking at the request or direction of client for maintenance, configuration, backups or other purposes that require the Subscription Service to be temporarily taken offline; (iii) client or third-party equipment, components, hardware, software, electrical lines, telecommunication lines, or network infrastructure not within the control of TeleTracking; (iv) lack of availability or untimely response time of client to respond to incidents that require client participation for source identification or resolution, including meeting customer commitments for any support under this SLA Policy; (v) performance issues caused by internet congestion, slowdown, or unavailability; (vi) denial of service, virus, malware, or hacker attacks; (vii) events resulting in an interruption or shut down of the Subscription Service due to circumstances reasonably believed by TeleTracking to be a significant threat to the normal operation of the Subscription Service, the operating infrastructure, the facility or data center from which the Subscription Service are provided, access to or the integrity of client data (e.g., a hacker or malware attack); and (viii) force majeure events shall not apply against the Service Level Availability target. Any TeleTracking beta, early adopter, non-production, or other test version of the Subscription Service, or other non-production system or environment, is excluded from this SLA Policy and Service Level Availability target.

2. **Subscription Service Credits:**

(a)  In the event of a failure by TeleTracking to meet the Service Level Availability target set forth in this SLA Policy, as client's sole and exclusive remedy, and at client's request pursuant to this SLA Policy, TeleTracking shall provide service credits in accordance with the following:

(i)  First month of missed availability or response minimum: The parties shall meet to discuss possible corrective actions if requested by client

1

**TELETRACKING SUBSCRIPTION SERVICE - SERVICE LEVEL AVAILABILITY POLICY**

    **(ii)**    Second consecutive month: 10% of the subscription fee paid for the applicable month for the affected Subscription Service application

    **(iii)**    Third consecutive month: 20% of the subscription fee paid for the applicable month for the affected Subscription Service application

    **(iv)**    Fourth consecutive month: 30% of the subscription fee paid for the applicable month for the affected Subscription Service application

    **(v)**    Fifth consecutive month: 40% of the subscription fee paid for the applicable month for the affected Subscription Service application

    **(vi)**    Sixth consecutive month: 50% of the subscription fee paid for the applicable month for the affected Subscription Service application

    **(vii)**    More than six consecutive months: Within thirty (30) days of such failure either party shall have the option to terminate the entire Agreement and upon such termination client shall receive a refund of all prepaid subscription fees that are unearned as of the date such termination is effective.

If more than one of the above (i through vii) is triggered, client will be eligible for the greater amount for the applicable month only. Credits shall be deducted from subsequent invoices for subscription fees for the affected Subscription Service application.

**(b)**    In order to receive a credit under this SLA Policy, client must request credit by emailing TeleTracking at SLA@teletracking.com within five days of the end of the applicable month and include the client name, facility address where subscription service was not available, the date and time that the subscription service was not available, and the length of time that the subscription service was not available. TeleTracking will investigate the request and respond to client regarding any credit due to client pursuant to this SLA Policy. If client submits a credit request and does not receive a prompt automated response indicating that the request was received, client must resubmit the request because the submission was not properly received and will not result in a credit. Clients who are past due or in default with respect to any payment or any material contractual obligations to TeleTracking are not eligible for any credit under this SLA Policy. The service credit is valid for up to one year from the month for which the credit was issued. TeleTracking shall calculate any service level downtime using TeleTracking's system logs and other records.

**3. Disaster Recovery:**

**(a)**    TeleTracking maintains a disaster recovery and support plan for TeleTracking Subscription Service. The resiliency and backups described in this SLA Policy apply only for TeleTracking Subscription Service. Client is solely responsible for developing a disaster recovery, business continuity, and backup plans to ensure data protection and continuity of its own operations in the event of a disaster and for backing up and recovering any on-premise TeleTracking Software or client and third party software.

DocuSign Envelope ID: B848B094-5A35-434C-BE5    395E4F86B0

**TELETRACKING SUBSCRIPTION SERVICE - SERVICE LEVEL AVAILABILITY POLICY**

(b)   Disaster recovery support provided by TeleTracking under this SLA Policy is intended to provide restoration of Subscription Service in the case of a major disaster, as declared by TeleTracking, that leads to loss of a data center and corresponding Subscription Service unavailability. For purposes of this SLA Policy, a "disaster" means an unplanned event or condition that causes a complete loss of access to the primary data center site used to provide the TeleTracking Subscription Service such that the client production environments at the primary data center site are not available. TeleTracking reserves the right to determine when to activate the disaster recovery plan. During execution of the disaster recovery plan, TeleTracking will provide regular status updates to clients.

(c)   TeleTracking maintains a redundant and resilient infrastructure designed to maintain high availability and to recover Subscription Service in the event of a significant disaster or disruption. TeleTracking designs its Subscription Service using principles of redundancy and fault-tolerance and an infrastructure that enables comprehensive data backup. TeleTracking continuously maintains at least two separate data centers that function as primary and secondary sites for the TeleTracking Subscription Service. Each client will have a standby production environment for the Subscription Service at a secondary site that resides in a data center separate from the client's primary production environment site.

(d)   TeleTracking will commence the disaster recovery plan under this SLA Policy upon its declaration of a disaster, and will target to recover the production data and use reasonable efforts to restore the production environment at the secondary site.  For each major regional jurisdictional area (e.g., the United States), TeleTracking operates both a production and secondary site within that region.  Client data is replicated in physically separate data center facilities in order to restore full services in the event of a disaster at a primary site. Backups are for TeleTracking's sole use in the event of a disaster.

(e)   TeleTracking provides for the recovery and restoration of a client's production version of the Subscription Service to the most recent available state following a disaster.  TeleTracking targets a maximum recovery time of 12 hours between its decision to activate the disaster recovery processes under this SLA Policy to failover the Subscription Service to the secondary data center site due to a declared disaster, and the point at which client can resume production operations in the standby production environment at the secondary data center site.  Customized reports of client, or other client customizations and integrations that depend on external components or third-party software, may require additional support and time to be restored and made available after recovery and restoration of the Subscription Service.  TeleTracking will not support non-critical fixes during an active failover event. Client will be solely responsible for issues arising from third party software and integrations to the TeleTracking Subscription Service not provided by TeleTracking, or otherwise approved by TeleTracking or the applicable TeleTracking documentation.

DocuSign Envelope ID: B848B094-5A35-434C-BE5    95E4F86B0

## TELETRACKING SUBSCRIPTION AND LICENSE AGREEMENT

EXHIBIT C

TRAVEL AND EXPENSE POLICY

The following sets out the Travel and Expense Policy for the purposes of this Agreement.  All travel expenses to be reimbursed by Client must be in compliance with the terms listed below in this Exhibit.  Any expenses incurred outside of these guidelines must be pre-approved in writing by Client.

- All travel must be approved in advance by Client.

- Air Travel
  - Coach rates only.
  - Two-week advance purchase should be obtained if possible.
  - Air travel will only be reimbursed for direct travel to Orlando and back to one destination. Any side trips will be at the expense of the TeleTracking.
  - If a change in flights is due to direct request of Client, Client shall pay the airline change/cancellation fee.  However, if the flight is changed for the convenience of either TeleTracking or TeleTracking's representative, TeleTracking shall be responsible for such airline change/cancellation fees.

- Lodging
  - Reimbursement will only be made for actual non-luxury accommodations and standard rooms.
  - If TeleTracking representatives will primarily be on the downtown Client campus, Client prefers such representatives stay at Hampton Inn & Suites Orlando Downtown South – Medical Center ("Hampton – OH campus").  Should TeleTracking representatives not stay at Hampton – OH campus, Client will reimburse for lodging at a rate not to exceed the contracted rate between Client and Hampton-OH campus, as such rates may be revised at the end of each calendar year.  That current rate is $129/night plus tax.

- Car Rental Expenses
  - Compact size rental will be reimbursed.
  - If multiple TeleTracking representatives travel together no more than 1 car per 3 people will be reimbursed.  If there are 3 representatives, a full-size car may be rented.
  - If multiple cars are necessary, prior written approval needs to be obtained.
  - Rates not to exceed $65 per day; $350 per week.  Rates exceeding this amount require prior written approval.
  - Options such as the following will not be reimbursed: Insurance options such as liability, supplementation liability, loss damage waiver, & personal accidents & effects, and GPS.

- Personal Car Expenses
  - If a personal or company vehicle is used to reach Client, Client will approve mileage reimbursement at the IRS designated rate per mile.
  - No direct auto expenses will be reimbursed (such as repair, towage, fuel, etc.).

- Meals
  - Reimbursement will not exceed $60 per day including tips and room service
  - No alcohol will be reimbursed.

- Other
  - No reimbursement will be made for personal phone calls (long distance or cell phone).
  - No dry cleaning or laundry will be reimbursed.
  - All expenses must be reasonable, actual, and documented by a receipt.

Any expenses not listed above or any exceptions to this document require prior written approval.

# TeleTracking Technologies, Inc.
## v.
# Orlando Health, Inc.

# Complaint Exhibit 2



The Times Building
336 Fourth Avenue
Pittsburgh, PA 15222

800.927.0294
TeleTracking.com

**VIA OVERNIGHT COURIER**

September 3, 2020

Orlando Health, Inc.                Orlando Health, Inc.
1414 Kuhl Avenue             1414 Kuhl Avenue
Mail Point 860                 Mail Point 860
Orlando, FL 32806            Orlando, FL 32806
Attn: Vice President/Chief Information Officer    Attn:  General Counsel

Orlando Health, Inc.
1414 Kuhl Avenue
Mail Point 860
Orlando, FL 32806
Attn:  Senior Counsel, I.S.

       **Re:   Material Breach of the TeleTracking Subscription and License Agreement ("TSLA")**

Dear Sir/Madam:

Pursuant to the notice provisions in Section 20(e) of the TeleTracking Subscription and License Agreement ("TSLA") between TeleTracking Technologies, Inc. ("TeleTracking") and Orlando Health, Inc. ("Orlando Health"), effective April 4, 2017, TeleTracking provides this notice to Orlando Health of Orlando Health's material breach of the TSLA.  TeleTracking urges Orlando Health to *immediately* abide by the terms of the TSLA.  Specifically, TeleTracking demands that Orlando Health and its employees cease and desist all improper behavior—as well as take concrete steps to address any past conduct immediately, including but not limited to seeking the immediate return of all TeleTracking Confidential Information or Proprietary Information (as defined herein) that may have been shared with Epic Systems Corporation ("Epic").

Orlando Health's violations and breaches of the TSLA have caused and will continue to cause grave and irreparable harm to TeleTracking's business.  TeleTracking hereby reserves all legal rights and remedies against Orlando Health and Epic, pursuant to the TSLA and otherwise, including its right to immediately terminate the TSLA for any non-curable material breach, to seek injunctive relief and/or recover or any and all monetary damages.

On August 24, representatives of TeleTracking participated in a meeting, in-person and via video conference, with Orlando Health representatives – Transport Manager, Katy Henderson and Lead Supervisor, Nick Daly ("Hospital Employees") – at Dr. Phillips Hospital of Orlando Health ("Hospital").  The meeting was organized for a current state of assessment of the Hospital's use of TeleTracking's solutions and services and to identify opportunities for improvement.  During the meeting, the Hospital Employees advised TeleTracking that the Hospital will be going live with competing replacement solutions from Epic at the end of January 2021.

During the meeting, the Hospital Employees admitted to sharing and/or describing for Epic TeleTracking's software platform functionality and the content of TeleTracking's output and reports. The Hospital Employees stated that they informed Epic that, in order to make the transition to Epic in January 2021, they needed to have the certain functionality available in TeleTracking's platform, reports and solutions not currently available in Epic's competing product(s). According to the Hospital Employees, Epic had stated that, although it did not currently have the functionality, it would commit to build such functionality by the Hospital's "go-live" date with Epic in January 2021. The Hospital Employees admitted to, in particular, describing TeleTracking's Equipment Return functionality to Epic. The Hospital Employees also informed TeleTracking that they shared with Epic the substance and content of TeleTracking's reports currently used by the Hospital to help with employee improvements in their departments. TeleTracking understands that the Hospital Employees have asked Epic to duplicate the output of these reports.

This conduct is in clear breach of the confidentiality and proprietary information provisions of the TSLA and has caused and will continue to cause irreparable harm to TeleTracking.

Among other obligations in the TSLA, Orlando Health agreed that,

- "Confidential Information" means (a) any software utilized by TeleTracking in the provision of the Software and respective source code;…(c) each party's technical information, including, but not limited, to TeleTracking's Documentation, Support, training materials, any information relating to software plans, designs, or the design or format of any graphical user interface (GUI), reports, results, and output generated by the Software.…

- TeleTracking also owns "all rights, title and interest in and to the subscription Service, Software and Documentation, including all training materials, software designs, and the design or format of any graphical user interface (GUI), report, result, or other output generated by the Subscription Service or Software (other than Client Data) and all related Intellectual Property Rights and any Improvements or other modifications, enhancements, customizations, and derivative works thereof. In addition, TeleTracking shall have a royalty-free, worldwide, transferable, sub-licensable irrevocable, and perpetual license to use or incorporate into the Subscription Service, Software or Documentation any Client Feedback." Further, "[a]ll rights, title and Interest to all ideas, techniques, know-how, designs, programs, development tools, processes, Integrations, interfaces, enhancements, and other technical information developed by TeleTracking in the course of performing Professional Services, and all Client Feedback pertaining thereto, shall vest solely and exclusively with TeleTracking." See TSLA, Section 13(b) (hereinafter referred to as "Proprietary Information").

In Section 13(d) of the TSLA, Orlando Health agreed that it would not, nor would it:

> "**permit any third party to, (i) modify or copy the Subscription Service, Software, Documentation, or Deliverables, or create any derivative works based on the Subscription Service, Software, Documentation, or Deliverables**, except that Client may make a reasonable number of copies of the Documentation and Deliverables as necessary to use the Subscription Service or Software;… **(iii) reverse engineer, reverse assemble, disassemble, or decompile any portion of the Subscription Service, Software, Documentation or**

**Deliverables, including, but not limited to, any software utilized by TeleTracking in the provision of the Subscription Service or Software; (iv) access the Subscription Service, Software, Documentation, or Deliverables in order to build or develop any commercially available or competitive product or service; (v) copy any features, functions, integrations, Interfaces, reporting formats, or graphics of the Subscription Service, Software, Documentation or Deliverables;…"**

Id. (emphasis added).

Based on the information conveyed by the Hospital Employees to TeleTracking representatives during the August 24 meeting, Orlando Health has materially breached these obligations. In addition, it has breached the obligations set forth in Section 14 of the TLSA governing the parties' Confidentiality Obligations: "A party will not disclose other than to its employees, directors, advisors, contractors or agents with a need to know and who are under nondisclosure obligations or use any Confidential Information of the other party, except as reasonably necessary to perform its obligations or exercise its rights pursuant to this Agreement, without the other party's prior written permission."

We are writing to seek *immediate* assurances that Orlando Health is complying with the obligations it owes to TeleTracking. Specifically, we ask that Orlando Health provide the following specific assurances in writing by no later than the close of business, Tuesday, September 8, that:

- Orlando Health will immediately cease from disclosing or communicating any of TeleTracking's Confidential Information or Proprietary Information to any third party, including but not limited to Epic, or use or refer to such information for any purpose other than that permitted by the TSLA.

- Orlando Health will immediately demand that Epic cease and desist:
  - modifying or copying the Subscription Service, Software, Documentation, or Deliverables, or creating any derivative works based on the Subscription Service, Software, Documentation, or Deliverables;
  - reverse engineering, reverse assembling, disassembling, or decompiling any portion of the Subscription Service, Software, Documentation or Deliverables, including, but not limited to, any software utilized by TeleTracking in the provision of the Subscription Service or Software;
  - accessing the Subscription Service, Software, Documentation, or Deliverables in order to build or develop any commercially available or competitive product or service;
  - copying any features, functions, integrations, Interfaces, reporting formats, or graphics of the Subscription Service, Software, Documentation or Deliverables.

- Orlando Health will immediately request the return of, and specifically identify for TeleTracking, any Confidential Information or Proprietary Information belonging to TeleTracking that has been shared with, discussed with, shown to, and/or is currently, or has at any time been, in Epic's possession, custody or control, in whatever form available.

TeleTracking expects that Orlando Health will comply with its obligations to TeleTracking. Should Orlando Health refuse to comply with its obligations, TeleTracking will have no choice but to evaluate and take all

appropriate steps to protect its legal rights, including seeking immediate injunctive relief to cease all offending activity, as well as the recovery or any and all monetary damages. In addition to any other remedies available, TeleTracking has the right to seek immediate "injunctive relief to enjoin such acts, without the necessity of proving actual damages or posting bond, it being acknowledged by the parties that any other available remedies may be inadequate." See TSLA, Section 14(d). Accordingly, TeleTracking reserves all such legal rights and remedies related to Orlando Health's obligations to TeleTracking, along with any and all legal rights and remedies it may have against Epic.

Please note that Orlando Health is legally obligated to maintain all potentially relevant information and documents, whether electronically stored or in hard copy. All such information and documents must be maintained as they currently exist and not be destroyed, tampered with, or modified; otherwise, Orlando Health could be subject to serious legal consequences. This includes but is not limited to any text messages or instant messaging of any Orlando Health employees related to TeleTracking.

Thank you for your prompt attention to this important matter. We look forward to hearing from you or your designated legal representative no later than the close of business, Tuesday, September 8, 2020.

Very truly yours,

Christopher Johnson
President

Enclosure: TeleTracking Subscription and License Agreement – Orlando Health, Inc.

cc:    Kim Roberts, Esq., Senior Vice President & General Counsel
       Gavin Eastgate, Esq., Assistant General Counsel